# EXHIBIT B

Electronically Filed
8/22/2019 4:13 PM
Steven D. Grierson
CLERK OF THE COURT

1 | **COMJD**
NICHOLAS G. VASKOV, ESQ.
2 | City Attorney
Nevada Bar No. 8298
3 | NANCY D. SAVAGE, ESQ.
Assistant City Attorney
4 | **CITY OF HENDERSON**
Nevada Bar No. 392
5 | 240 Water Street, MSC 144
Henderson, NV 89015
6 |
(702) 267-1200 Telephone
7 | (702) 267-1201 Facsimile
nancy.savage@cityofhenderson.com
8 |

9 | ROBERT T. EGLET, ESQ.
Nevada Bar No. 3402
10 | ROBERT M. ADAMS, ESQ.
Nevada Bar No. 6551
11 | RICHARD K. HY, ESQ.
Nevada Bar No. 12406
12 | **EGLET ADAMS**
400 S. 7th Street, 4th Floor
13 | Las Vegas, NV 89101
Tel.: (702) 450-5400
14 | Fax: (702) 450-5451
E-Mail      eservice@egletlaw.com
15 | *Attorneys for Plaintiff, City of Henderson*

CASE NO: A-19-800695-B
Department 11

**DISTRICT COURT**

**CLARK COUNTY, NEVADA**

| | |
|---|---|
| CITY OF HENDERSON, | Case No.: |
| | Dept No.: |
| Plaintiff, | |
| | |
| v. | |
| | |
| PURDUE PHARMA, L.P.; PURDUE | **COMPLAINT** |
| PHARMA, INC.; THE PURDUE | |
| FREDERICK COMPANY, INC.; PURDUE | **REQUEST FOR BUSINESS COURT** |
| PHARMACEUTICALS, L.P.; RICHARD S. | |
| SACKLER; JONATHAN D. SACKLER; | **EXEMPT FROM ARBITRATION** |
| MORTIMER D.A. SACKLER; KATHE A. | |
| SACKLER; ILENE SACKLER LEFCOURT; | |

| | |
|---|---|
| 1 | DAVID A. SACKLER; BEVERLY ) |
| | SACKLER; THERESA SACKLER; PLP ) |
| 2 | ASSOCIATES HOLDINGS L.P.; ROSEBAY ) |
| | MEDICAL COMPANY L.P.; BEACON ) |
| 3 | COMPANY; TEVA PHARMACEUTICALS ) |
| 4 | USA, INC.; CEPHALON, INC.; ENDO ) |
| | HEALTH SOLUTIONS INC.; ENDO ) |
| 5 | PHARMACEUTICALS, INC.; PAR ) |
| | PHARMACEUTICAL, INC.; PAR ) |
| 6 | PHARMACEUTICAL COMPANIES, INC.; ) |
| 7 | ALLERGAN INC.; ALLERGAN USA INC.; ) |
| | ACTAVIS, INC. f/k/a WATSON ) |
| 8 | PHARMACEUTICALS, INC.; WATSON ) |
| | LABORATORIES, INC.; MALLINCKRODT ) |
| 9 | LLC; SPECGX LLC; ACTAVIS LLC; ) |
| 10 | ACTAVIS PHARMA, INC. f/k/a WATSON ) |
| | PHARMA, INC.; JOHNSON & JOHNSON; ) |
| 11 | JANSSEN PHARMACEUTICALS, INC.; ) |
| 12 | NORAMCO, INC.; ) |
| | AMERISOURCEBERGEN DRUG ) |
| 13 | CORPORATION; CARDINAL HEALTH, ) |
| | INC.; CARDINAL HEALTH 6 INC.; ) |
| 14 | CARDINAL HEALTH TECHNOLOGIES ) |
| | LLC; CARDINAL HEALTH 414 LLC; ) |
| 15 | CARDINAL HEALTH 200 LLC; ) |
| 16 | MCKESSON CORPORATION; ) |
| | WALGREENS BOOTS ALLIANCE, INC.; ) |
| 17 | WALGREEN CO.; WALGREEN EASTERN ) |
| 18 | CO., INC.; WALMART INC.; CVS HEALTH ) |
| | CORPORATION; CVS PHARMACY, INC.; ) |
| 19 | CVS INDIANA L.L.C.; CVS RX SERVICES, ) |
| | INC.; CVS TENNESSEE DISTRIBUTION, ) |
| 20 | L.L.C.; MASTERS PHARMACEUTICAL, ) |
| 21 | LLC f/k/a MASTERS PHARMACEUTICAL, ) |
| | INC.; C & R PHARMACY d/b/a KEN'S ) |
| 22 | PHARMACY f/k/a LAM'S PHARMACY, ) |
| | INC.; EXPRESS SCRIPTS HOLDING ) |
| 23 | COMPANY; EXPRESS SCRIPTS, INC.; ) |
| 24 | AIDA B MAXSAM; STEVEN A HOLPER ) |
| | MD; STEVEN A. HOLPER, M.D., ) |
| 25 | PROFESSIONAL CORPORATION; ) |
| 26 | HOLPER OUT-PATIENTS MEDICAL ) |
| | CENTER, LTD.; DOES 1 through 100; ROE ) |
| 27 | CORPORATIONS 1 through 100 and ZOE ) |
| | PHARMACIES 1 through 100, inclusive, ) |
| 28 | |
| | Defendants. |

2

1    Plaintiff the City of Henderson, Nevada, by and through the undersigned attorneys, files
2  this Complaint against the named Defendants seeking to recover its damages as a result of the
3  opioid epidemic Defendants caused, and alleges as follows:

**INTRODUCTION**

5    1.    Opioid addiction and overdose in the United States as a result of prescription
6  opioid use has reached epidemic levels over the past decade.

7    2.    While Americans represent only 4.6% of the world's population, they consume
8  over 80% of the world's opioids.

9    3.    Since 1999, the amount of prescription opioids sold in the U.S. has nearly
10  quadrupled. In 2010, 254 million prescriptions were filled in the U.S. – enough to medicate every
11  adult in America around the clock for a month. In that year, 20% of all doctors' visits resulted in
12  the prescription of an opioid (nearly double the rate in 2000).

13    4.    By 2014, nearly two million Americans either abused or were dependent upon
14  opioids.

15    5.    On March 22, 2016, the Food and Drug Administration (FDA) recognized opioid
16  abuse as a "public health crisis" that has a "profound impact on individuals, families and
17  communities across our country."

18    6.    The Centers for Disease Control (CDC) reports that overdoses from prescription
19  opioids are a driving factor in the 15-year increase in opioid overdose deaths.

20    7.    From 2000 to 2015, more than half a million people died from drug overdoses
21  (including prescription opioids and heroin). The most recent figures from the CDC suggest that
22  175 Americans die everyday from an opioid overdose (prescription and heroin).

23    8.    Many addicts, finding painkillers too expensive or too difficult to obtain, have
24  turned to heroin. According to the American Society of Addiction Medicine, four out of five
25  people who try heroin today started with prescription painkillers.

26    9.    County and city governments and the services they provide their citizens have been
27  strained to the breaking point by this public health crisis.

28    10.    The dramatic increase in prescription opioid use over the last two decades, and the
resultant public-health crisis, is no accident.

3

1      11.     The crisis was precipitated by Defendants, who, through deceptive means, and

2 using one of the biggest pharmaceutical marketing campaigns in history, carefully engineered and

3 continue to support a dramatic shift in the culture of prescribing opioids by falsely portraying both

4 the risks of addiction and abuse and the safety and benefits of long-term use.

5      12.     Defendant drug companies named herein, manufacture, market, and sell

6 prescription opioids (hereinafter "opioids"), including brand-name drugs like Oxycontin, Vicodin

7 and Percocet, as well as generics like oxycodone and hydrocodone, which are powerful narcotic

8 painkillers.

9      13.     Historically, because they were considered too addictive and debilitating for the

10 treatment of chronic pain (like back pain, migraines and arthritis), opioids were used only to treat

11 short-term acute pain or for palliative (end-of-life) care.

12      14.     Defendants' goal was simple: to dramatically increase sales by convincing doctors

13 that it was safe and efficacious to prescribe opioids to treat not only the kind of severe and short-

14 term pain associated with surgery or cancer, but also for a seemingly unlimited array of less

15 severe, longer-term pain, such as back pain, headaches and arthritis.

16      15.     Defendants knew that their opioid products were addictive, subject to abuse, and

17 not safe or efficacious for long-term use.

18      16.     Defendants' nefarious plan worked and they dramatically increased their sales and

19 reaped billions upon billions of dollars of profit at the expense of millions of people who are now

20 addicted and the thousands who have died as a result.

21      17.     Defendant drug companies should never place their desire for profits above the

22 health and well being of their customers or the communities where those customers live, because

23 they know prescribing doctors and other health-care providers rely on their statements in making

24 treatment decisions, and drug companies must tell the truth when marketing their drugs and ensure

25 that their marketing claims are supported by science and medical evidence.

26      18.     Defendants broke these simple rules and helped unleash a healthcare crisis that has

27 had far-reaching financial, social, and deadly consequences in the City of Henderson and

28 throughout Nevada.

4

1    19.    Defendants falsely touted the benefits of long-term opioid use, including the
2  supposed ability of opioids to improve function and quality of life, even though there was no
3  "good evidence" to support their claims.

4    20.    Defendants disseminated these common messages to reverse the popular and
5  medical understanding of opioids.

6    21.    As a result of the drug companies' marketing campaign, opioids are now the most
7  prescribed class of drugs generating over $11 billion in revenue for drug companies in 2014 alone.

8    22.    As a result of the drug companies' marketing campaign, the fatalities continued to
9  mount while the living continue to suffer.

10    23.    In 2015, over 33,000 Americans died of a drug overdose involving opioids with
11  studies suggesting that these fatalities are statistically underreported.   In 2015, the estimated
12  economic impact of the opioid crisis was $504.0 billion, or 2.8 % of our U.S.'s gross domestic
13  product that same year.   Previous estimates of the economic cost of the opioid crisis greatly
14  understate it by undervaluing the most important component of the loss—fatalities resulting from
15  overdoses.

16    24.    Most opioid related deaths occur among those between the ages of approximately
17  25 and 55 years old.   Studies have shown that the overall fatality rate was 10.3 deaths per 100,000
18  population, and in the 25 to 55 year old age group, fatality rates were much higher, ranging from
19  16.1 to 22.0 deaths per 100,000 population.

20
21
22
23
24
25
26
27
28

5



**Figure 2. Opioid-involved Overdose Deaths by Age in 2015**
(Number of deaths)

Source: CDC Wonder database, multiple cause of death files

25.     In addition to the cost of fatalities each year, opioid misuse among the living imposes important costs as well. It is estimated that prescription opioid misuse increases healthcare and substance abuse treatment costs in the United States by $29.4 billion, increases criminal justice costs by $7.8 billion, and reduces productivity among those who do not die of overdose by $20.8 billion (in 2015 $). The total nonfatal cost of $58.0 billion divided by the 1.9 million individuals with a prescription opioid disorder in 2013 results in an average cost of approximately $30,000.[1] And when patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin, fueling the secondary drug market.

26.     Further compounding issues is that this problem is worsening at an alarming rate. According to a report published by the White House Council of Economic Advisors (CEA), opioid-involved overdose deaths have doubled in the past ten years and quadrupled in the past sixteen.



[1] Florence, C., Zhou, C., Luo, F. and Xu, L. 2016. "The Economic Burden of Prescription Opioid Overdose, Abuse, and Dependence in the United States, 2013." *Medical Care,* 54(10): 901-906.

6

1

2

3

4

5

6

7

8

9

10

11

12

13

14



**Figure 1. Opioid–involved Overdose Deaths, 1999–2015**
(Thousands of Deaths)

Source: CDC Wonder database, multiple cause of death files

15    27.    The crisis that Defendants caused has directly impacted the City of Henderson as
16  it bears the financial brunt of this epidemic as it unfolds in our community.

17    28.    Apart from the toll on human life, the crisis has financially strained the services
18  the City of Henderson provides its residents and employees. Human services, social services,
19  court services, law enforcement services, health services, have all been severely impacted by the
20  crisis. For example, as a direct and foreseeable consequence of Defendants' egregious conduct,
21  the City of Henderson paid, and continues to pay, a significant amount for health care costs that
22  stem from prescription opioid dependency. These costs include results of the unnecessary and
23  excessive opioid prescriptions, substance abuse treatment services, first responder and emergency
24  services, and health and treatment services, among others. Defendants' conduct also caused the
25  City of Henderson to incur substantial economic, administrative and social costs relating to opioid
26  addiction and abuse, including criminal justice costs, victimization costs, child protective services
27  costs, lost productivity costs, and education and prevention program costs among others.

28    29.    After creating a public health crisis, Defendants have not pulled their opioid
products from the market, acknowledged the very real dangers of addiction and abuse even if the

.7

1  opioids are taken as prescribed, or acknowledged that opioids are inappropriate for long-term pain
2  management. Instead, Defendants have taken the position that their opioid products are not
3  dangerous and continue to sell these dangerous and addictive drugs, thereby continuing to fuel
4  the crisis.

5       30.  As a result, physicians, pharmacists and patients are not able to appropriately and
6  adequately evaluate the relevant risks associated with opioids use, particularly the risks to patients
7  who have been and are being exposed to, unnecessarily, including but not limited to the risk of
8  severe and disabling addiction, actual addiction, the consequences of addiction, and other adverse
9  medical conditions. Additionally, the rising numbers of persons addicted to opioids have led to a
10  dramatic increase of social problems, including drug abuse and diversion and the commission of
11  criminal acts to obtain opioids. Consequently, public health and safety have been significantly
12  and negatively impacted due to the misrepresentations and omissions by Defendants regarding
13  the appropriate uses and risks of opioids, ultimately leading to widespread inappropriate use of
14  the drug.

15       31.  As a result of Defendants' misconduct, physicians, pharmacists and patients have
16  not been provided with accurate information about the appropriate uses, risks and safety of these
17  drugs, thus causing the crisis before us as well as giving rise to this lawsuit.

18       32.  Plaintiff files this Complaint naming the drug companies herein as Defendants and
19  placing the industry on notice that the City of Henderson is taking action to abate the public
20  nuisance that plagues our community.

21       33.  By its Complaint, the City of Henderson seeks to recover from Defendants its
22  damages as a result of the opioid public-health crisis Defendants caused. Namely, this action is
23  brought by this Plaintiff pursuant to constitutional, statutory, common law and/or equitable
24  authority for purposes of, *inter alia*:

25           a.  recovering restitution and reimbursement for all the costs expended by the
26            City of Henderson for health care services and programs associated with
27            the diagnosis and treatment of adverse health consequences of opioids use,
28            including but not limited to, addiction;

8

1            b.    recovering restitution and reimbursement for all the costs consumers have

2                 incurred in excessive and unnecessary prescription costs related to opioids;

3            c.    disgorgement;

4            d.    recovering damages for all costs incurred and likely to be incurred in an

5                 effort to combat the abuse and diversion of opioids in the City of

6                 Henderson;

7            e.    recovering damages incurred as costs associated with the harm done to the

8                 public health and safety.

9        34.    However, Plaintiff does not bring claims, as part of this action, for products

10   liability nor does the City of Henderson seek compensatory damages for death, physical injury to

11   person, emotional distress, or physical damage to property.

## PARTIES AND JURISDICTION

**A. Plaintiff, the City of Henderson.**

15       35.    Plaintiff, the City of Henderson ("HENDERSON" or "Plaintiff"), is a municipal

16   corporation incorporated in Clark County, Nevada under the laws of the State of Nevada,

17   including but not limited to Article 8 of the Nevada Constitution.

18       36.    Plaintiff provides a wide range of services on behalf of its residents, including

19   services for families and children, public health, public assistance, law enforcement, fire

20   protection, addiction services, and emergency care.

21       37.    Plaintiff has all the powers possible for a city to have under the constitution of the

22   State of Nevada, and the laws of the State of Nevada.

23       38.    Plaintiff has standing to bring this litigation to provide for the orderly government

24   of the City of Henderson and to address matters of local concern including the public health,

25   safety, prosperity, security, comfort, convenience and general welfare of its citizens.

26       39.    The City of Henderson declares that the unlawful distribution of prescription

27   opiates, by the Defendants named herein, has created a serious public health crisis of opioid abuse,

28   addiction, morbidity and mortality and is a public nuisance.

1    40.    Plaintiff is authorized by law to abate any nuisance and prosecute in any court of
2  competent jurisdiction, any person who creates, continues, contributes to, or suffers such nuisance
3  to exist and prevent injury and annoyance from such nuisance.

4    **B. Defendants, Drug Manufacturers.**

5    41.    Defendant PURDUE PHARMA L.P. is a limited partnership organized under the
6  laws of Delaware, and registered and authorized to do business in the State of Nevada, under the
7  laws thereof. At all times relevant herein, PURDUE PHARMA L.P. takes and took advantage of
8  the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend
9  drug patents. PURDUE PHARMA INC. is a corporation organized under the laws of both
10  Delaware and New York, with its principal place of business in Stamford, Connecticut, and THE
11  PURDUE FREDERICK COMPANY, INC. is a Delaware corporation with its principal place of
12  business in Stamford, Connecticut. Defendant PURDUE PHARMACEUTICALS, L.P., ("Purdue
13  Pharmaceuticals") is and was a limited partnership organized under the laws of the State of
14  Delaware.  At all times relevant hereto, the foregoing, (collectively, "PURDUE") are and were
15  in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing,
16  selling and/or distributing OxyContin and have done so to and within the State of Nevada. At all
17  times relevant herein, PURDUE hired "Detailers" in Henderson, Nevada, to make personal
18  contact with physicians and clinics to advocate for the purchase and use of opioid medications
19  which were contrary to known safety concerns and sound medical advice.

20    42.    In 2007, Purdue settled criminal and civil charges against it for misbranding
21  OxyContin and agreed to pay a $635 million fine – at the time, one of the largest settlements with
22  a drug company for marketing misconduct. None of this stopped Purdue. In fact, Purdue continued
23  to create the false perception that opioids were safe and effective for long-term use, even after being
24  caught, by using unbranded marketing methods to circumvent the system.  On May 8, 2007, as
25  part of these settlements, Purdue entered into a consent judgment with the State of Nevada, in
26  which it agreed to a number of terms intended to prevent any further misleading marketing in the
27  State of Nevada. In short, Purdue paid the fine when caught and then continued business as usual,
28  deceptively marketing and selling billions of dollars of opioids each year.

43.    At all relevant times, Purdue, which is a collection of private companies, has been

10

1  controlled by members of the extended Sackler family, who are the ultimate intended beneficiaries
2  of virtually all of Purdue's profit distributions. The individual Defendants named in this action are
3  the remaining living Sackler family members who served on the board of Purdue Pharma, Inc.
4  (the "Purdue board"), which functioned as the nexus of decision-making for all of Purdue.

5      44.    Defendant RICHARD S. SACKLER became a member of the Purdue board in
6  1990 and became its co-chair in 2003, which he remained until he left the board in 2018. He was
7  also Purdue's head of research and development from at least 1990 through 1999, and its president
8  from 1999 through 2003. He resides in New York, Florida, and Texas. He currently holds an active
9  license to practice medicine issued by the New York State Education Department. He is a trustee
10  of the Sackler School of Medicine, a director and the vice president of the Raymond and Beverly
11  Sackler Foundation, and a director and the president and treasurer of the Richard and Beth Sackler
12  Foundation, Inc., all three of which are New York Not-for-Profit Corporations.

13      45.    Defendant JONATHAN D. SACKLER was a member of Purdue's board from
14  1990 through 2018. He resides in Connecticut. He is a trustee of the Sackler School of Medicine,
15  the president and CEO of the Raymond and Beverly Sackler Foundation, and the vice president
16  of the Richard and Beth Sackler Foundation Inc., all three of which are New York Not-for-Profit
17  Corporations.

18      46.    Defendant MORTIMER D.A. SACKLER has been a member of Purdue's Board
19  since 1993. He resides in New York. Mortimer is a director and the president of the Mortimer and
20  Jacqueline Sackler Foundation, and a director and the vice president and treasurer of the Mortimer
21  D. Sackler Foundation, Inc., both of which are New York Not-for-Profit Corporations.

22      47.    Defendant KATHE A. SACKLER was a member of Purdue's board from 1990
23  through 2018. She resides in New York and Connecticut. Kathe is a director and president of the
24  Shack Sackler Foundation, a director and vice president and secretary of the Mortimer D. Sackler
25  Foundation Inc. and is a governor of the New York Academy of Sciences, all three of which are
26  New York Not-for-Profit Corporations.

27      48.    Defendant ILENE SACKLER LEFCOURT was a member of Purdue's board
28  between 1990 and 2018. She resides in New York. She is a director of Columbia University and

11

1   is the president of the Sackler Lefcourt Center for Child Development Inc., both of which are New
2   York Not-for-Profit Corporations.

3       49.     Defendant DAVID A. SACKLER was a member of Purdue's board from 2012
4   through 2018. He resides in New York.

5       50.     Defendant BEVERLY SACKLER was a member of Purdue's board from 1993
6   through 2017. She resides in Connecticut. Beverly Sackler serves as a Director and the Secretary
7   and Treasurer of the Raymond and Beverly Sackler Foundation, a New York Not-for-Profit
8   Corporation.

9       51.     Defendant THERESA SACKLER was a member of Purdue's board from 1993
10  through 2018. She resides in New York and the United Kingdom.

11      52.     These individual Defendants used a number of known and unknown entities
12  named as Defendants herein as vehicles to transfer funds from Purdue directly or indirectly to
13  themselves. These include the following:

14      53.     Defendant PLP ASSOCIATES HOLDINGS L.P., which is a Delaware limited
15  partnership and a limited partner of Purdue Holdings L.P. Its partners are PLP Associates Holdings
16  Inc. and BR Holdings Associates L.P.

17      54.     Defendant ROSEBAY MEDICAL COMPANY L.P., which is a Delaware limited
18  partnership ultimately owned by trusts for the benefit of one or more of the individual Defendants.
19  Its general partner is Rosebay Medical Company, Inc., a citizen of Delaware and Connecticut. The
20  Board of Directors of Rosebay medical Company, Inc. includes board members Richard S. Sackler
21  and Jonathan D. Sackler.

22      55.     Defendant BEACON COMPANY, which is a Delaware general partnership
23  ultimately owned by trusts for the benefit of members of one or more of the individual Defendants.

24      56.     The foregoing individual Defendants are referred to collectively as "the Sacklers."
25  The foregoing entities they used as vehicles to transfer funds from Purdue directly or indirectly
26  to themselves are referred to as "the Sackler Entities." Together, the Sacklers and the Sackler
27  Entities are referred to collectively as "the Sackler Defendants."

28

12

1    57.    Defendant TEVA PHARMACEUTICALS USA, INC., is a Delaware corporation
2  with its principal place of business located in North Whales, Pennsylvania. Teva USA is a wholly
3  owned subsidiary of TEVA PHARMACEUTICALS INDUSTRIES LTD., an Israeli Corporation.
4  TEVA develops, makes, manufactures, and distributes generic opioid medications worldwide,
5  including within the City of Henderson, Nevada.

6    58.    Defendant CEPHALON, INC., is Delaware corporation with its principal place of
7  business located in Frazer, Pennsylvania. In 2011, Teva Ltd. acquired CEPHALON, INC.

8    59.    Defendant ENDO HEALTH SOLUTIONS INC., is a Delaware corporation with
9  its principal place of business located in Malvern, Pennsylvania. ENDO PHARMACEUTICALS,
10  INC., is a wholly-owned subsidiary of Endo Health Solutions Inc., and is a Delaware corporation
11  with its principal place of business in Malvern, Pennsylvania.

12    60.    Defendant PAR PHARMACEUTICAL, INC. is a Delaware corporation with its
13  principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a
14  wholly- owned subsidiary of Par Pharmaceutical Companies, Inc. f/k/a Par Pharmaceutical
15  Holdings, Inc. Defendant PAR PHARMACEUTICAL COMPANIES, INC. is a Delaware
16  corporation with its principal place of business located in Chestnut Ridge, New York. Par
17  Pharmaceutical Companies, Inc. (and by extension its subsidiary, Par Pharmaceutical, Inc.,)
18  (collectively, "Par Pharmaceutical") was acquired by Endo International plc in September 2015
19  and is currently an operating company of Endo International plc. Endo Health Solutions Inc.,
20  Endo Pharmaceuticals, Inc., Par Pharmaceutical, and their DEA registrant subsidiaries and
21  affiliates, (collectively, "Endo"), manufacture opioids sold nationally, and in the City of
22  Henderson, Nevada.

23    61.    Defendants ALLERGAN INC. and ALLERGAN USA INC. are Delaware
24  corporations with headquarters in Madison, New Jersey. ALLERGAN INC. and ALLERGAN
25  USA INC. (ALLERGAN INC. and ALLERGAN USA INC., collectively are referred to herein
26  as "Allergan.") Prior to that, WATSON PHARMACEUTICALS, INC., acquired ACTAVIS,
27  INC. in October 2012; the combined company changed its name to ACTAVIS, INC.
28  SUBSEQUENTLY, ACTAVIS, INC. acquired ALLERGAN and changed the parent company to
ALLERGAN.

13

62.     Defendant WATSON LABORATORIES, INC. is, and was at all times relevant herein, a Nevada corporation with its principal place of business in Corona, California, and is a wholly owned subsidiary of Allergan PLC, the parent company of Defendants ALLERGAN INC. and ALLERGAN USA INC., (f/k/a ACTAVIS, INC., f/k/a WATSON PHARMACEUTICALS, INC.). At all times relevant herein, Watson Laboratories, Inc. takes and took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend drug patents. ACTAVIS PHARMA, INC. (f/k/a ACTAVIS, INC.), is a Delaware corporation with its principal place of business in New Jersey, and was formerly known as WATSON PHARMA, INC. ACTAVIS LLC is a Delaware limited liability company with its principal place of business in Parsippany, New Jersey.

63.     MALLINCKRODT LLC is a Delaware corporation with its principal place of business in Hazelwood, Missouri. MALLINCKRODT operates in the United States under the name Mallinckrodt Pharmaceuticals, with its United States headquarters are located in Hazelwood, Missouri. At all times relevant herein, Defendant MALLINCKRODT was in the business of designing, testing, manufacturing, labeling, advertising, promoting, marketing, selling, and/or distributing opioid products known as Exalgo, Roxicodone, and Xartemis XR, and has done so to and within the State of Nevada.

64.     Defendant SPECGX LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri, and is registerd with the Nevada Secretary of State to do business in Nevada. SpecGx LLC is a subsidiary of Mallinckrodt plc that operates its specialty generics business. Defendants Mallinckrodt LLC and SpecGx LLC, together with their DEA and Nevada registrant and licensee subsidiaries and affiliates (collectively, "Mallinckrodt"), manufacture, market, sell, and distribute pharmaceutical drugs throughout the United States, and in the City of Henderson, Nevada.

65.     Defendant JOHNSON & JOHNSON is a New Jersey corporation with its principal place of business in New Brunswick, New Jersey. Defendant JANSSEN PHARMACEUTICALS, INC. is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and is a wholly-owned subsidiary of Johnson & Johnson. Johnson & Johnson corresponds with the Food and Drug Administration ("FDA") regarding Janssen Pharmaceuticals, Inc.'s products.

14

1 Janssen Pharmaceuticals, Inc. was formerly known as Ortho-McNeil-Janssen Pharmaceuticals,
2 Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc. Defendant NORAMCO,
3 INC. is a Delaware company headquartered in Wilmington, Delaware and was a wholly owned
4 subsidiary of Johnson & Johnson and its manufacturer of active pharmaceutical ingredients until
5 July 2016 when Johnson & Johnson sold its interests to SK Capital. Johnson & Johnson, Janssen
6 Pharmaceuticals, Inc., and Noramco, Inc., together with their DEA and Nevada registrant and
7 licensee subsidiaries and affiliates (collectively, "Janssen"), are or have been engaged in the
8 manufacture, promotion, distribution, and sale of opioids nationally, and in the City of Henderson.

9     66.     That at all times relevant herein, PURDUE PHARMA, L.P.; PURDUE PHARMA,
10 INC.; THE PURDUE FREDERICK COMPANY, INC. dba THE PURDUE FREDERICK
11 COMPANY, INC.; PURDUE PHARMACEUTICALS, L.P.; RICHARD S. SACKLER;
12 JONATHAN D. SACKLER, MORTIMER D.A. SACKLER; KATHE A. SACKLER; ILENE
13 SACKLER LEFCOURT; DAVID A. SACKLER; BEVERLY SACKLER; THERESA
14 SACKLER; PLP ASSOCIATES HOLDINGS L.P.; ROSEBAY MEDICAL COMPANY L.P.;
15 BEACON COMPANY; TEVA PHARMACEUTICALS USA, INC.; TEVA
16 PHARMACEUTICALS INDUSTRIES LTD; CEPHALON, INC.; ENDO HEALTH
17 SOLUTIONS INC.; ENDO PHARMACEUTICALS, INC.; PAR PHARMACEUTICAL, INC.;
18 PAR PHARMACEUTICAL COMPANIES, INC.; ALLERGAN INC.; ALLERGAN USA INC.;
19 ACTAVIS, INC. f/k/a WATSON PHARMACEUTICALS, INC.; WATSON LABORATORIES,
20 INC.; ACTAVIS LLC; ACTAVIS PHARMA, INC. f/k/a WATSON PHARMA, INC.;
21 MALLINCKRODT, LLC; SPECGX LLC; JOHNSON & JOHNSON; JANSSEN
22 PHARMACEUTICALS, INC.; and NORAMCO, INC.; (collectively "Defendant
23 Manufacturers" or "Defendants") were, and currently are, regularly engaged in business in the
24 City of Henderson. More specifically, Defendants were, and currently are, in the business of
25 designing, testing, manufacturing, labeling, advertising, promoting, marketing, and/or selling
26 opioids throughout the City of Henderson, Nevada.

27     **C. Defendants, Wholesale Distributors.**

28     67.     All Defendant Wholesale Distributors are "wholesalers" as that term is defined in
NRS 639.016.

15

1      68.    Defendant, AMERISOURCEBERGEN DRUG CORPORATION, is, and at all

2 times pertinent hereto, was, a foreign corporation authorized to do business in the County of

3 Clark, State of Nevada.   Upon information and belief, and at all times relevant hereto,

4 AMERISOURCEBERGEN DRUG CORPORATION's principal place of business is located in

5 Chesterbrook, Pennsylvania, operating distribution centers in Ohio.

6      69.    Defendant, CARDINAL HEALTH, INC. is, and at all times pertinent hereto, was,

7 a foreign corporation with multiple wholly-owned subsidiaries incorporated under the laws of the

8 State of Nevada and/or authorized to do business in said state, and conducting business in the

9 County of Clark, State of Nevada.

10     70.    Upon information and belief, and at all times relevant hereto, CARDINAL

11 HEALTH, INC.'s principal office is located in Dublin, Ohio, operating, distribution centers in

12 Ohio. CARDINAL HEALTH 6 INC. is a Nevada Domestic Corporation. CARDINAL HEALTH

13 TECHNOLOGIES LLC is a Nevada Domestic LLC. At all times relevant herein, CARDINAL

14 HEALTH TECHNOLOGIES LLC takes and took advantage of the legislative, regulatory and tax

15 schemes of the State of Nevada to own, maintain and defend patents, including those relating to

16 drug labeling, coding and distribution.

17     71.    CARDINAL HEALTH 414 LLC is an LLC incorporated under the laws of the

18 state of Delaware and headquartered in Dublin, Ohio, and registered and authorized to conduct

19 business within the State of Nevada. At all times relevant herein, CARDINAL HEALTH 414

20 LLC takes and took advantage of the legislative, regulatory and tax schemes of the State of

21 Nevada to own, maintain and defend medical patents. Further, CARDINAL HEALTH 414 LLC

22 operates a pharmacy within the physical confines of the County of Clark. CARDINAL HEALTH

23 200 LLC is an LLC incorporated under the laws of the state of Delaware and headquartered in

24 Dublin, Ohio, and registered and authorized to conduct business within the State of Nevada. To

25 Wit, CARDINAL HEALTH 200 LLC has obtained a business license in the County of Clark to

26 register as a "Procurement Vendor," which is a company registered to submit bids to sell products

27

28

16

to Nevada and Clark County government entities, such as to sell medical goods or drugs to the County-operated hospital.

72.     Defendant, McKESSON CORPORATION, is, and at all times pertinent hereto, was, foreign corporation authorized to do business in the County of Clark, State of Nevada. Upon information and belief, and at all times relevant hereto, McKESSON CORPORATION's principal place of business is located in San Francisco, California, operating distribution centers in Ohio. At all times relevant herein, McKESSON CORPORATION takes and took advantage of the legislative, regulatory and tax schemes of the State of Nevada to own, maintain and defend patents, including those relating to drug labeling, coding and distribution.

73.     Defendant WALGREENS BOOTS ALLIANCE, INC. is a Delaware corporation with its principal place of business in Illinois.

74.     Defendant WALGREEN CO. is and was registered to do business with the Nevada Secretary of State as an Illinois corporation with its principal place of business in Deerfield, Illinois. Walgreen Co. is a subsidiary of Walgreens Boots Alliance, Inc. and does business under the trade name Walgreens.

75.     Defendant WALGREEN EASTERN CO., INC. is a New York corporation with its principal place of business in Deerfield, Illinois.

76.     Defendants Walgreens Boots Alliance, Inc., Walgreen Eastern Co., and Walgreen Co. are collectively referred to as "Walgreens". Walgreens, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor. At all times relevant to this Complaint, Walgreens distributed prescription opioids throughout the United States, including in Clark County, Nevada. At all relevant times, this Defendant operated as a licensed pharmacy wholesaler in the State of Nevada, and in Clark County, Nevada.

77.     Defendant WALMART INC., ("Walmart") formerly known as Wal-Mart Stores,

17

Inc., is and was registered to do business with the Nevada Secretary of State as a Delaware corporation with its principal place of business in Arkansas. Walmart, through its various DEA registered subsidiaries and affiliated entities, conducts business as a licensed wholesale distributor under named business entities including Wal-Mart Warehouse #6045 a/k/a Wal-Mart Warehouse #45. At all times relevant to this Complaint, Walmart distributed prescription opioids throughout the United States, including in Clark County, Nevada. At all relevant times, this Defendant operated as a licensed pharmacy wholesaler in the State of Nevada, and in Clark County, Nevada.

78.     Defendant CVS HEALTH CORPORATION ("CVS HC") is a Delaware corporation with its principal place of business in Woonsocket, Rhode Island. CVS HC conducts business as a licensed wholesale distributor under the following named business entities, among others: CVS Orlando FL Distribution L.L.C. and CVS Pharmacy, Inc. (collectively "CVS"). At all times relevant to this Complaint, CVS distributed prescription opioids throughout the United States, including in Clark County, Nevada.

79.     Defendant CVS PHARMACY, INC. ("CVS Pharmacy") is a Rhode Island corporation with its principal place of business in Woonsocket, Rhode Island. CVS Pharmacy is a subsidiary of CVS HC. At all times relevant to this Complaint, CVS Pharmacy operated as a licensed pharmacy wholesaler, distributor and controlled substance facility in Clark County, Nevada.

80.     Defendant CVS Pharmacy, Inc. distributed prescription opioids to Plaintiffs' Community through the following wholly owned subsidiaries that are alter-egos of CVS Pharmacy, Inc.:

a.     Defendant CVS INDIANA L.L.C., an Indiana limited liability company with its principal place of business in Indianapolis, Indiana;

b.     Defendant CVS RX SERVICES, INC. d/b/a CVS Pharmacy Distribution Center,

18

1    a New York corporation with its principal place of business in Woonsocket, RI; and

2         c.    Defendant CVS TENESSEE DISTRIBUTION, L.L.C. a Tennessee corporation

3    with its principal place of business in Woonsocket, Rhode Island.

4    81.    Defendant CVS Pharmacy, Inc. instituted set-up, ran, directed, and staffed with its

5    own employees, the majority of the Suspicious Order Monitoring and diversion control functions

6

7    for CVS Indiana, LLC, CVS Rx Services, Inc., and CVS TN Distribution LLC.

8    82.    Collectively, CVS Health Corporation, CVS Pharmacy, Inc., CVS Indiana, LLC,

9    CVS Rx Services, Inc., and CVS TN Distribution, LLC are referred to as "CVS." CVS conducts

10   business as a licensed wholesale distributor. At all times relevant to this Complaint, CVS

11   distributed prescription opioids throughout the United States, including in Clark County, Nevada;

12   CVS pharmacies located in Clark County supplemented their supply of Schedule 3 controlled

13

14   substances including prescription opioids through purchases made by CVS from outside vendors;

15   and CVS pharmacies located in Clark County were supplied with Schedule 2 controlled

16   substances including prescription opioids through purchases made by CVS from outside vendors.

17

18   83.    Defendant,   MASTERS   PHARMACEUTICAL,   LLC   f/k/a   MASTERS

19   PHARMACEUTICAL, INC., is, and at all times pertinent hereto, was, foreign corporation

20   authorized to do business in the County of Clark, State of Nevada. Upon information and belief,

21   and at all times relevant hereto, MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS

22   PHARMACEUTICAL, INC.'s, operates distribution centers in Ohio.

23   84.    AMERISOURCEBERGEN DRUG CORPORATION; CARDINAL HEALTH,

24   INC.; CARDINAL HEALTH 6 INC.; CARDINAL HEALTH TECHNOLOGIES LLC;

25   CARDINAL HEALTH 414 LLC; CARDINAL HEALTH 200 LLC; McKESSON

26   CORPORATION; WALGREENS BOOTS ALLIANCE, INC.; WALGREEN CO.;

27   WALGREEN EASTERN CO., INC.; WALMART INC.; CVS HEALTH CORPORATION; CVS

28   PHARAMCY, INC.; CVS INDIANA, LLC; CVS RX SERVICES, INC.; CVS TN

DISTRIBUTION, LLC; and MASTERS PHARMACEUTICAL, LLC f/k/a MASTERS

19

1　PHARMACEUTICAL, INC.; (collectively "Defendant Distributors" or "Defendants")
2　distributed opioids or facilitated the distribution of opioids into Clark County. The United States
3　Drug Enforcement Administration has found it necessary to levy disciplinary action against these
4　and each of these including large fines and suspension or permanent cancellation of their licenses
5　for distribution of controlled substances, based on dangerous and abusive distribution practices
6　as detailed herein and below.

7　　85.　　Defendant Distributors purchased opioids from manufacturers, including the
8　named Defendants herein, and distributed them to pharmacies throughout the City of Henderson,
9　and the State of Nevada.

10　　86.　　Defendant Distributors played an integral role in the chain of opioids being
11　distributed throughout the City of Henderson, and the State of Nevada.

12　　**D. Defendants, Detailers.**

13　　87.　　Defendant AIDA B MAXSAM (hereinafter "DETAILER") is a natural person
14　who is, and at all relevant times herein was, a resident of Clark County, Nevada, who is or was
15　engaged in specialty drug sales on behalf of Defendant Manufacturer and Distributor PURDUE.

16　　88.　　Defendant DETAILER was trained to, and did in fact, make personal contact with
17　physicians and clinics within the City of Henderson, Nevada for the purpose, and with the result,
18　of encouraging them to prescribe opioid medications in a manner inconsistent with known safety
19　concerns and contrary to sound medical practice.

20　　**E. Defendants, Pharmacies and Pharmacy Benefit Managers.**

21　　89.　　Defendant C & R PHARMACY d/b/a KEN'S PHARMACY f/k/a LAM'S
22　PHARMACY, INC. ("LAM'S PHARMACY") is and was at all times pertinent hereto a domestic
23　corporation authorized to do business in Clark County, Nevada. Upon information and belief,
24　and at all times relevant hereto, KEN'S PHARMACY f/k/a LAM'S PHARMACY, INC.'s
25　principal place of business was and is in Las Vegas, Nevada. Plaintiff is informed, believes, and
26　alleges that C & R PHARMACY d/b/a KEN'S PHARMACY purchased and is the possessor and
27　controller of all of the assets of the former LAM'S PHARMACY including drugs, premises,
28　prescription records, customer lists, telephone numbers, goodwill, and all other business assets.

1    90.    Defendant LAM'S PHARMACY and other pharmacies (collectively "Defendant
2  Pharmacies" or "Defendants") sold opioids to residents of the City of Henderson, Nevada giving
3  rise to the opioid crisis.

4    91.    Pharmacy Benefit Managers ("PBMs") administer benefit contracts and riders that
5  determine coverage for some or all of the costs of pharmaceutical products and/or provide access
6  to such products, sometimes through the PBM's own mail-order pharmacy. PBMs establish
7  formularies which govern which drugs are reimbursed and how. PBMs also determine pre-
8  authorization requirements and negotiate with drug manufacturers to offer preferred drug
9  formulary placement for drugs. Additionally, PBMs establish reimbursement rates for drugs
10  dispensed and can earn revenue from fees from health plans and insurers, rebates and other
11  incentives from drug manufacturers, including administrative fees and volume bonuses, and fees
12  from maintaining pharmacy networks. Given their "gatekeeper" role, PBMs exercise significant
13  power over the quantity of prescription opioids that enter the market.

14    92.    PBMs also have massive quantities of data regarding the opioid prescribing and
15  usage of the doctors and patients who participate in their plans. As a result, PBMs can
16  identify: (a) patients who receive, and doctors who prescribe opioids in excessive volumes,
17  frequency, or dosage; (b) patients who receive, and doctors who prescribe opioids in combination
18  with other drugs indicative of diversion; (c) patients who receive opioids after having been treated
19  or while being treated for opioid overdoses and addition; and (d) patients who receive opioids
20  who are at higher risk for overdose, for example, because they also receive benzodiazepines. This
21  information, and their representations about their efforts to manage and improve patients' health,
22  created an obligation for PBMs to identify, report, and otherwise address potential diversion or
23  other dangerous instances of opioid use and prescribing.

24    93.    In addition, PBMs distribute opioids directly through their mail order pharmacies,
25  and, like other pharmacies, are DEA and state registrants. In distributing opioids, PBMs are
26  obligated to prevent diversion and to identify, report, and not ship suspicious orders of
27  opioids. Upon information and belief, to be confirmed by transaction data in the exclusive
28  possession of the PBMs, PBMs failed to carry out these duties.

21

1      94.     Defendant EXPRESS SCRIPTS HOLDING COMPANY ("ESHC") is a Delaware

2 corporation with its principal place of business in St. Louis, Missouri. Defendant EXPRESS

3 SCRIPTS, INC. ("ESI") is a wholly-owned subsidiary of ESHC and is incorporated in the State

4 of Delaware with its principal place of business located in St. Louis, Missouri. In 2012, ESI

5 acquired its rival, Medco Health Solutions Inc., otherwise known as Merck Medco, in a \$29.1

6 billion deal. As a result of the merger, ESHC was formed and became the largest PBM in the

7 nation, filing a combined 1.4 billion prescriptions for employers and insurers. ESHC and ESI are

8 collectively referred to as "Express Scripts."

9      95.     Upon information and belief, Express Scripts derived and continues to derive

10 substantial revenue as a result of managing pharmacy benefits throughout Nevada, including

11 within the City of Henderson.

12      96.     Defendant Pharmacies and PBMs played an integral role in the chain of opioids

13 being sold in the City of Henderson, Nevada.

14      **F. Defendants, Health Care Providers**

15      97.     Defendant STEVEN A HOLPER MD is, and was at all times relevant herein, a

16 resident of Clark County, Nevada and was a licensed medical doctor in the State of Nevada. Upon

17 information and belief, and at all times relevant hereto, Defendant STEVEN A HOLPER MD,

18 conducted business and provided medical services as STEVEN A. HOLPER, M.D., PC, a Nevada

19 Domestic Professional Corporation in Clark County, Nevada. Defendant HOLPER OUT-

20 PATIENTS MEDICAL CENTER, LTD. (collectively, with STEVEN A HOLPER MD and

21 STEVEN A. HOLPER M.D., PC, "Defendant Providers" or "HOLPER"), is, and was at all times

22 relevant herein, a Nevada Domestic Corporation with its principal place of business in Clark

23 County, Nevada, and served as the location from which Defendant STEVEN A HOLPER MD

24 provided his medical services.

25

26      98.     HOLPER habitually prescribed and delivered highly addictive and potentially

27 lethal opioid medications to patients in the City of Henderson, Nevada who did not meet the

28 qualifications for such medications.

22

1    99.    HOLPER participated in a deceptive scheme to obtain authorization for such
2    prescriptions from health insurance providers.

3    **G. Defendants, Does, Roes and Zoes.**

4    100.    That the true names and the capacities, whether individual, agency, corporate,
5    associate or otherwise, of Defendant DOES 1 through 100, inclusive, are unknown to Plaintiff.
6    Plaintiff will ask leave of the Court to amend this Complaint to show the true names and capacities
7    of these Defendants, when they become known to Plaintiff. Plaintiff believes each Defendant
8    named as DOE was responsible for the misconduct alleged herein.

9    101.    That the true names and the capacities, whether individual, agency, corporate,
10   associate or otherwise, of Defendant ROE CORPORATIONS I through 100, are unknown to
11   Plaintiff.  These Defendants include the manufacturer(s), distributor(s) and any third party that
12   may have developed, manufactured, produced, sold, altered or otherwise distributed the subject
13   drug, which caused Plaintiff's injuries as complained herein. Plaintiff will ask to leave of the
14   Court to amend this Complaint to show the true names and capacities of these Defendants, when
15   they become known to Plaintiff. Plaintiff believes each Defendant named as ROE
16   CORPORATION was responsible for contributing to the misconduct alleged herein.

17   102.    That the true names and the capacities, whether individual, agency, corporate,
18   associate or otherwise, of Defendant ZOE PHARMACIES I through 100, are unknown to
19   Plaintiff.  These Defendants include the pharmacies or similarly situated retailers that may have
20   developed, manufactured, produced, sold, altered or otherwise distributed opioids which caused
21   Plaintiff's injuries as complained herein. Plaintiff will ask to leave of the Court to amend this
22   Complaint to show the true names and capacities of these Defendants, when they become known
23   to Plaintiff. Plaintiff believes each Defendant named as ZOE PHARMACY was responsible for
24   contributing to the misconduct alleged herein.

25   103.    That Plaintiff is informed and believes, and based upon such information and
26   belief, alleges that each of the Defendants herein designated as DOES, ROES and/or ZOES are
27   in some manner responsible for the misconduct alleged herein.

28

23

1    104.    Plaintiff is informed and believes and thereon alleges that at all relevant times
2 herein mentioned Defendants, and each of them, were the agents and/or servants and/or partners
3 and/or joint venture partners and/or employers and/or employees and/or contractors of the
4 remaining Defendants and were acting within the course and scope of such agency, employment,
5 partnership, contract or joint venture and with the knowledge and consent of the remaining
6 Defendants at the time of the event leading to the misconduct alleged herein.

7    **H. Jurisdiction & Venue.**

8    105.    That exercise of the jurisdiction by this Court over each and every Defendant in
9 this action is appropriate because each and every Defendant has done, and continues to do,
10 business in the State of Nevada, and committed a tort in the State of Nevada. Additionally, this
11 Court has jurisdiction over the claims alleged herein as they arise under Nevada statutes and
12 Nevada common law.

13    106.    Venue is proper in the District Court of Clark County, Nevada where part of the
14 claims alleged herein occurred.

15                          **GENERAL FACTUAL ALLEGATIONS**

16    **A. Opioids Generally**

17    107.    Defendants design, manufacture, distribute, sell, market, and advertise
18 prescription opioids, including brand-name drugs like Oxycontin, and generics like oxycodone,
19 which are powerful narcotic painkillers. Historically, because they were considered too addictive
20 and debilitating for the treatment of chronic pain (like back pain, migraines and arthritis), opioids
21 were used only to treat short-term acute pain cancer patients or for palliative (end-of-life) care.

22    108.    Due to the lack of evidence that opioids improved patients' ability to overcome
23 pain and function, coupled with evidence of greater pain complaints as patients developed
24 tolerance to opioids over time and the serious risk of addiction and other side effects, the use of
25 opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not
26 prescribe opioids for chronic pain.

27    109.    In the 1970s and 1980s, studies were conducted that made clear the reasons to
28 avoid opioids. By way of example, the World Health Organization ("WHO") in 1986 published
an "analgesic ladder" for the treatment of cancer pain. The WHO recommended treatment with

                                        24

1    over-the-counter or prescription acetaminophen or non-steroidal anti-inflammatory drugs
2    ("NSAIDs") first, then use of unscheduled or combination opioids, and then stronger (Schedule
3    II or III) opioids if pain persisted. The WHO ladder pertained only to the treatment of cancer pain,
4    and did not contemplate the use of narcotic opioids for chronic pain - because the use of opioids
5    for chronic pain was not considered appropriate medical practice at the time.

6         110.    Due to concerns about their addictive qualities, opioids have been regulated as
7    controlled substances by the U.S. Drug Enforcement Administration ("DEA") since 1970. The
8    labels for scheduled opioid drugs carry black box warnings of potential addiction and "[s]erious,
9    life-threatening, or fatal respiratory depression," as a result of an excessive dose.

10   **B. Defendants' Fraudulent Marketing**

11        111.    To take advantage of the lucrative market for chronic pain patients, Defendants
12   developed a well-funded marketing scheme based on deception. Defendants used both direct
13   marketing and unbranded advertising disseminated by purported independent third parties to
14   spread false and deceptive statements about the risks and benefits of long-term opioid use.

15        112.    Yet these statements were not only unsupported by or contrary to the scientific
16   evidence, they were also contrary to pronouncements by and guidance from federal agencies such
17   as the Food and Drug Administration ("FDA") and Centers for Disease Control and Prevention
18   ("CDC") based on that evidence. They also targeted susceptible prescribers and vulnerable patient
19   populations, including the elderly and veterans.

20        113.    Pursuant to Nevada law, specifically NRS 639.570, Defendants were, at all
21   relevant times hereto, required to adopt a marketing code of conduct; adopt a training program to
22   provide appropriate training to employees as to the code of conduct; conduct annual audits to
23   monitor compliance with the code of conduct; adopt policies and procedures for investigating
24   instances of noncompliance with the code of conduct; and identify a compliance officer for such
25   purposes. Additionally, Defendants were, at all relevant times hereto, required submit reports
26   related to the marketing code of conduct on an annual basis.

27        114.    Defendants also used kickback systems, prior authorization systems, and
28   incentives to encourage health care providers to prescribe the opioid medications.

   ***Direct Marketing Efforts***

115.   Defendants' direct marketing of opioids generally proceeded on two tracks. First, Defendants conducted, and continue to conduct, promotional campaigns extolling the purported benefits of their branded drugs. Advertisements were branded to deceptively portray the benefits of opioids for chronic pain. For instance, Defendant Purdue commissioned series of ads in medical journals, called "Pain vignettes," for Oxycontin in 2012. These ads featured chronic pain patients and recommended opioids for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that Oxycontin would help the writer work more effectively. Purdue agreed in late 2015 and 2016 to halt these misleading representations in New York, but no similar order has been issued in Nevada. Defendant Mallinckrodt marketed its products, Exalgo and Xartemis as specially formulated to reduce abuse and published information on its website minimizing addition risk as well as advocating access to opioids.

116.   Second, Defendants promoted, and continue to promote, the use of opioids for chronic pain through "detailers" – sales representatives who visited individual doctors and medical staff in their offices – and small-group speaker programs. Defendants' detailing to doctors is effective. By establishing close relationships with prescribing physicians, Defendants' sales representatives are able to disseminate their misrepresentations in targeted, one-on-one settings that allowed them to differentiate their opioids and to address individual prescribers' concerns about prescribing opioids for chronic pain.

117.   These direct techniques were also accompanied by kickbacks, prior authorization systems, and the use of other incentives to encourage health care providers, to prescribe the opioid medication for chronic pain.

118.   Numerous studies indicate that marketing impacts prescribing habits, with face-to-face detailing having the greatest influence. Defendants devoted, and continue to devote, massive resources to direct sales contacts with doctors.

119.   Defendants paid sham "speaker fees" to doctors to run educational events to discuss the use of their products, but the fees were actually intended to reward those doctors for prescribing Defendants' product and incentivize them to prescribe more of those products to patients. In fact, often times the speakers spoke at events with minimal to no attendance simply

1  to collect the fee. These kickbacks increased as the number of prescriptions written by the
2  speakers increased.

3      120.    Upon information and belief and at all times relevant herein, Defendants ensured,
4  and continue to ensure, marketing consistency nationwide through national and regional sales
5  representative training; national training of local medical liaisons, the company employees who
6  respond to physician inquiries; centralized speaker training; single sets of visual aids, speaker
7  slide decks, and sales training materials; and nationally coordinated advertising. Upon
8  information and belief, Defendants' sales representatives and physician speakers were required
9  to adhere to prescribed talking points, sales messages, and slide decks, and supervisors rode along
10  with them periodically to both check on their performance and compliance.

11      121.    Upon information and belief and at all times relevant herein, Defendants
12  employed, and continue to employ, the same marketing plans and strategies and deployed the
13  same messages in Nevada as they did nationwide.

14      122.    As the opioid epidemic spread, many health care providers recognized the dangers
15  of opioid medication, including health risks and the risk of addiction. Others, however, continued
16  to prescribe such medication for off-label purposes without adequately warning patients of the
17  dangers associated with opioids.

18      123.    Upon information and belief, Defendant Providers received financial incentives to
19  continue writing prescriptions for such opioid medication despite the dangers associated with
20  same.

21      124.    Across the pharmaceutical industry, "core message" development is funded and
22  overseen on a national basis by corporate headquarters. This comprehensive approach ensures
23  that Defendants' messages are accurately and consistently delivered across marketing channels –
24  including detailing visits, speaker events, and advertising – and in each sales territory. Defendants
25  consider this high level of coordination and uniformity crucial to successfully marketing their
26  drugs.

27      ***Unbranded/Third-Party Marketing by Defendants***

28      125.    In addition to direct communications, Defendants utilized third-party marketing to
promote their line of prescription opiates. This "unbranded" marketing refers not to a specific

27

1   drug, but more generally to a disease state or treatment. For instance, these marketing materials
2   generally promoted opioid use but did not name a specific opioid. Through these unbranded
3   materials, Defendants presented information and instructions concerning opioids that were
4   generally contrary to, or at best, inconsistent with, information and instructions listed on
5   Defendants' branded marketing materials and drug labels and with Defendants' own knowledge
6   of the risks, benefits and advantages of opioids. An example of such unbranded marketing
7   techniques is Defendant Mallinckrodt's Collaborating and Acting Responsible to Ensure Safety
8   (C.A.R.E.S.) Alliance, which promoted a book "Defeat Chronic Pain Now!" minimizing the risk
9   of opioid addiction and emphasizing opioid therapy for regular use for moderate chronic pain.

10       126.   Using "Key Opinion Leaders" (KOLs) and "Front Groups," Defendants
11   disseminated their false and misleading statements regarding the efficacy of opioids. These KOLs
12   and Front Groups were important elements of Defendants' marketing plans, because they
13   appeared independent and therefore outside of FDA oversight. However, Defendants did so
14   knowing that unbranded materials typically were not submitted or reviewed by the FDA. By
15   acting through third parties, Defendants was able both to avoid FDA scrutiny and to give the false
16   appearance that these messages reflected the views of independent third parties. Afterwards,
17   Defendants would cite to these sources as corroboration of their own statements.

18       127.   Defendants worked, and continue to work, in concert with the Front Groups and
19   KOLs which they funded and directed to carry out a common scheme to deceptively market the
20   risks, benefits, and superiority of opioids to treat chronic pain. Although participants knew this
21   information was false and misleading, these misstatements were nevertheless disseminated to
22   Nevada prescribers and patients.

23                          ***Key Opinion Leaders (KOLs)***

24       128.   Upon information and belief and at all times relevant herein, Defendants recruited,
25   as part of its unbranded marketing efforts, a cadre of doctors who were financially sponsored
26   because of their preference to aggressively treat chronic pain with opioids. KOLs were retained
27   by Defendants to influence their peers' medical practice, including but not limited to their
28   prescribing behavior. KOLs gave lectures, conducted clinical trials and occasionally made

1 presentations at regulatory meetings or hearings. KOLs were carefully vetted to ensure that they
2 were likely to remain on message and supportive of Defendant' agenda.

3      129.    Defendants' financial support helped these doctors become respected industry
4 experts. Upon information and belief, these doctors repaid Defendants by extolling the benefits
5 of opioids to treat chronic pain as quid pro quo. Defendants would cite to these sources later on
6 as corroboration of their own false and misleading statements regarding opioids.

7      **Front Groups**

8      130.    Defendants also entered into arrangements with seemingly unbiased and
9 independent patient and professional organizations to promote opioids for the treatment of chronic
10 pain. Under their direction and control, these "Front Groups" generated treatment guidelines,
11 unbranded materials, and programs that favored chronic opioid therapy. They also assisted
12 Defendants by refuting negative articles, by advocating against regulatory changes that would
13 limit opioid prescribing in accordance with the scientific evidence, and by conducting outreach
14 to vulnerable patient populations targeted by Defendants.

15     131.    These Front Groups depended on Defendants for funding and, in some cases, for
16 survival. Defendants exercised significant control over programs and materials created by these
17 groups by collaborating on, editing, and approving their content, and by funding their
18 dissemination. In so doing, Defendants made sure that these Front Groups would generate only
19 favorable messages. Despite this, the Front Groups held themselves out as independent and
20 serving the needs of their members – whether patients suffering from pain or doctors treating
21 those patients.

22     132.    While Defendants utilized many Front Groups, one of the most prominent of was
23 the American Pain Foundation ("APF"). APF received more than $10 million in funding from
24 opioid manufacturers from 2007 until it closed its doors in May 2012. Upon information and
25 belief, Defendant Purdue was one of its primary financial backers.

26     133.    APF issued education guides for patients, reporters, and policymakers that touted
27 the benefits of opioids for chronic pain and trivialized their risks, particularly the risk of addiction.
28 APF also launched a campaign to promote opioids for returning veterans, which has contributed
to high rates of addiction and other adverse outcomes – including death – among returning

29

1  soldiers. APF also engaged in a significant multimedia campaign – through radio, television and
2  the internet – to educate patients about their "right" to pain treatment, namely opioids. All of the
3  programs and materials were available nationally and were intended to reach Nevadans.

4       134.    In or about May 2012, the U.S. Senate Finance Committee began investigating
5  APF to determine the relationship, financial and otherwise, between the organization and the
6  manufacturers of opioid analgesics. The investigation caused considerable damage to APF's
7  credibility as an objective and neutral third party, and Purdue, upon information and belief,
8  stopped financially supporting the organization.

9       135.    Within days of being targeted by Senate investigation, APF's board voted to
10  dissolve the organization "due to irreparable economic circumstances." APF "cease[d] to exist,
11  effective immediately."

12       ***Continuing Medical Education (CMEs)***

13       136.    CMEs are ongoing professional education programs required for physicians.
14  Physicians must attend a certain number and, often, type of CME programs each year as a
15  condition of their licensure. These programs are delivered in person, often in connection with
16  professional organizations' conferences, and online, or through written publications. Doctors rely
17  on CMEs not only to satisfy licensing requirements, but to get information on new developments
18  in medicine or to deepen their knowledge in specific areas of practice. Because CMEs are
19  typically delivered by KOLs who are highly-respected in their fields and are thought to reflect
20  their medical expertise, they can be especially influential with doctors.

21       137.    By utilizing CMEs, Defendants sought to reach general practitioners, whose broad
22  area of focus and lack of specialized training in pain management made them particularly
23  dependent upon CMEs and, as a result, especially susceptible to Defendants' deceptions.
24  Defendants sponsored CMEs promoted chronic opioid therapy.

25       138.    These CMEs, while often generically titled to relate to the treatment of chronic
26  pain, focused on opioids to the exclusion of alternative treatments, inflated the benefits of opioids,
27  and frequently omitted or downplayed their risks and adverse effects.

28

1    139.   Upon information and belief and at all times relevant herein, CMEs paid for or

2  sponsored by Defendants were intended to reach prescribing physicians in the City of Henderson,

3  Nevada.

4    *Drug Manufacturer Defendants—Kickbacks to Encourage Prescriptions*

5    140.   Upon information and belief, Defendants utilized a system of kickbacks to

6  encourage health care providers to write prescriptions for, and deliver, the opioid medications.

7  Kickbacks took the form of "speaker fees" paid to health care providers that spoke at programs

8  regarding the purported benefits and safety of using opioid medications to treat chronic pain. Such

9  speakers were recruited by Defendants based upon the number of prescriptions the providers

10 wrote for opioid medications. The more prescriptions written, the more times the speaker was

11 asked to appear at a program, and the more "speaker fees" were paid to the provider. Defendants'

12 employees were rewarded when their "speakers" increased the prescriptions they wrote. These

13 speaking programs did not result in other health care providers writing a significant number of

14 prescriptions for Defendants' products, but the "speakers" continued to be paid to speak so long

15 as they increased their own prescriptions. Many of the speaker programs had few or no attendees

16 that would actually be able to write prescriptions for Defendants' products. Upon information and

17 belief, Defendant Providers, benefitted from such programs.

18    *Prior Authorization Programs*

19    141.   Upon information and belief, Defendants developed prior authorization programs

20 in order to gain authorization and approval from insurance companies to cover the costly opioid

21 products for off-label uses. These programs involved representatives from Defendants contacting

22 insurance companies and representing that they are from a health care provider's office rather

23 than from the Defendant manufacturer or distributor; providing inaccurate diagnosis information

24 on the authorization requests; and drafting Letters of Medical Necessity for health care providers

25 to sign-off on for purposes of receiving authorization from health insurance providers. Upon

26 information and belief, Defendant Providers also participated in misleading the health insurance

27 providers to authorize the numerous prescriptions written for opioid medications.

28    *Medication Switch Programs*

31

142.    Upon information and belief, Defendants encouraged and incentivized detailers and sales people to convince health care providers to substitute stronger, more expensive opioid medications for medications that patients were already prescribed. Detailers and sales people were informed that they would receive higher pay and/or bonuses by convincing health care providers to change prescriptions. These programs ignored any warnings that one opioid drug could not be substituted on a one-for-one basis with another opioid medication. Each opioid medication is unique in its dosing and has a different approved dosage level. Switch programs encouraged a one-for-one substitution despite the differences in the original and substitute medication.

### Drug Manufacturer Defendants—Marketing Targeting the Elderly and Veterans

143.    In its pursuit of profit, Defendants targeted vulnerable segments of the population suffering from chronic pain including veterans and the elderly.

144.    Defendants' targeted marketing to the elderly and the absence of cautionary language in their promotional materials creates a heightened risk of serious injury. Studies have shown that elderly patients who used opioids had a significantly higher rate of death, heart attacks, and strokes than users of NSAIDs. Additionally, elderly patients taking opioids have been found to suffer elevated fracture risks, greater risk for hospitalizations, and increased vulnerability to adverse drug effects and interactions, such as respiratory depression.

145.    Defendants' efforts were successful. Since 2007, opioid prescriptions for the elderly have grown at twice the rate of prescriptions for adults between the ages of 40 and 59. Based on anecdotal evidence, many of these elderly patients started on opioids for chronic back pain or arthritis.

146.    Veterans are also suffering greatly from the effects of Defendants' targeted marketing. Opioids are particularly dangerous to veterans. According to a study published in the 2013 Journal of American Medicine, veterans returning from Iraq and Afghanistan who were prescribed opioids have a higher incidence of adverse clinical outcomes, like overdoses and self-inflicted and accidental injuries, than the general U.S. population.

147.    *Exit Wounds*, a 2009 publication sponsored by Defendant Purdue and distributed by APF, written as a personal narrative of one veteran, describes opioids as "underused" and the "gold standard of pain medications" and fails to disclose the risk of addiction, overdose, or injury.

32

1   It notes that opioid medications "increase a person's level of functioning" and that "[l]ong
2   experience with opioids shows that people who are not predisposed to addiction are unlikely to
3   become addicted to opioid pain medications."

4       148.    *Exit Wounds* downplays and minimizes the risks from chronic opioid therapy and
5   does not disclose the risk that opioids may cause fatal interactions with benzodiazepines taken by
6   a significant number of veterans. It is not the unbiased narrative of a returning war veteran. It is
7   another form of marketing, sponsored by Defendant Purdue.

8       149.    The deceptive nature of *Exit Wounds* is made obvious in comparing it to guidance
9   on opioids published by the U.S. Department of Veterans Affairs and the Department of Defense
10  in 2010 and 2011. The VA's Taking Opioids Responsibly describes opioids as "dangerous." It
11  cautions against taking extra doses and mentions the risk of overdose and the dangers of
12  interactions with alcohol.

13          **C. Defendants' Misrepresentations**

14      150.    To convince prescribing physicians and prospective patients that opioids are safe,
15  Defendants deceptively concealed the risks of long-term opioid use, particularly the risk of
16  addiction, through a series of misrepresentations. Defendants manipulated their promotional
17  materials and the scientific literature to make it appear that these items were accurate, truthful,
18  and supported by objective evidence when they were not.

19      151.    These misrepresentations regarding opioids include but are not limited to:

20          a.  Starting patients on opioids was low-risk because most patients would not become
21              addicted, and because those who were at greatest risk of addiction could be readily
22              identified and managed;

23          b.  Patients who displayed signs of addiction probably were not addicted and, in any
24              event, could easily be weaned from the drugs;

25          c.  The use of higher opioid doses, which many patients need to sustain pain relief as
26              they develop tolerance to the drugs, do not pose special risks; and

27          d.  Abuse-deterrent opioids both prevent abuse and overdose and are inherently less
28              addictive.

33

152.     Upon information and belief, Defendants have not only failed to correct these misrepresentations, they continue to make them today.

153.     For example, Defendant Purdue misrepresented, and continues to misrepresent, Oxycontin as providing 12 continuous hours of pain relief with one dose. However, studies have shown, as well as Purdue's own internal research, that the effects of the drug wear off in or about six (6) hours in one quarter of its patients and in or about ten (1) hours in one-half of its patients.

154.     Defendants also misrepresented the benefits of chronic opioid therapy. For example, Defendant Purdue falsely claimed that long-term opioid use improved patients' function and quality of life in advertisements for Oxycontin in medical journals entitled, "Pain Vignettes" which were case studies featuring patients with pain conditions persisting over several months and recommending Oxycontin for them. These advertisements implied that Oxycontin improves patients' function.

155.     However, these claims find no support in the scientific literature. In 2008, the FDA sent a warning letter to an opioid manufacturer, making it clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience." Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is no good evidence that opioids improve pain or function with long-term use, and . . . complete relief of pain is unlikely."

156.     Upon information and belief and at all times relative herein, Defendants made and/or disseminated deceptive statements related to opioids, including, but not limited to, in the following ways:

    a. Creating, sponsoring, and assisting in the distribution of patient education materials distributed to Nevada and Henderson consumers that contained deceptive statements;

    b. Creating and disseminating advertisements that contained deceptive statements concerning the ability of opioids to improve function long-term and concerning the evidence supporting the efficacy of opioids long-term for the treatment of chronic non-cancer pain;

34

1        c.  Assisting in the distribution of guidelines that contained deceptive statements

2            concerning the use of opioids to treat chronic non-cancer pain and misrepresented

3            the risks of opioid addiction;

4        d.  Developing and disseminating scientific studies that misleadingly concluded

5            opioids are safe and effective for the long-term treatment of chronic non-cancer

6            pain and that opioids improve quality of life, while concealing contrary data;

7        e.  Targeting the elderly and veterans by assisting in the distribution of guidelines that

8            contained deceptive statements concerning the use of opioids to treat chronic non-

9            cancer pain and misrepresented the risks of opioid addiction in this population;

10       f.  Exclusively disseminating misleading statements in education materials to Nevada

11           and Henderson hospital doctors and staff while purportedly educating them on new

12           pain standards; and

13       g.  Making deceptive statements concerning the use of opioids to treat chronic non-

14           cancer pain to Nevada and Henderson prescribers through in-person detailing.

15   **D. Duty of Drug Distributors and Pharmacies as Gate Keepers**

16   157.    In Nevada, opioids are a controlled substance and are categorized as "dangerous

17   drugs." Therefore, Defendant Distributors have a duty to exercise reasonable care under the

18   circumstances.

19   158.    Additionally, pursuant to Nevada law, specifically NRS 639.570, Defendant

20   Wholesale Distributors were, at all relevant times hereto, required to adopt a marketing code of

21   conduct; adopt a training program to provide appropriate training to employees as to the code of

22   conduct; conduct annual audits to monitor compliance with the code of conduct; adopt policies

23   and procedures for investigating instances of noncompliance with the code of conduct; and

24   identify a compliance officer for such purposes. Additionally, Defendants were, at all relevant

25   times hereto, required submit reports related to the marketing code of conduct on an annual basis.

26   159.    This involves a duty not to create a foreseeable risk of harm to others. Additionally,

27   one who engages in affirmative conduct-and thereafter realizes or should realize that such conduct

28   has created an unreasonable risk of harm to another-is under a duty to exercise reasonable care to

    prevent the threatened harm.

160. All opioid distributors are required and have a duty to maintain effective controls against opioid diversion. They are also required and have a duty to create and use a system to identify and report downstream suspicious orders of controlled substances to law enforcement. Suspicious orders include orders of unusual size, orders deviating substantially from the normal pattern, and orders of unusual frequency.

161. To comply with these requirements, distributors must know their customers, report suspicious orders, conduct due diligence, and terminate orders if there are indications of diversion.

162. Defendant Distributors each have an affirmative duty to act as a gatekeeper guarding against the diversion of the highly addictive, dangerous opioid drugs.

163. Defendant Distributors each have a non-delegable duty to identify and track suspicious orders of controlled substances.

164. In addition, Defendant Distributors must also stop shipment on any order which is flagged as suspicious and only ship orders which were flagged as potentially suspicious if. after conducting due diligence, the distributor can determine that the order is not likely to be diverted into illegal channels.

165. Defendant Distributors have a duty to detect questionable and suspicious orders to prevent the diversion of opioids into the City of Henderson, which include orders of unusual size, orders deviating substantially from a normal pattern, and orders of an unusual frequency.

166. Defendant Distributors not only have a duty to detect and prevent diversion of controlled prescription drugs, but undertake such efforts as responsible members of society.

167. In so doing, this is intended to reduce the widespread diversion of these drugs out of legitimate channels into the illicit market. while at the same time providing the legitimate drug industry with a unified approach to narcotic and dangerous drug control.

168. Notwithstanding this duty and obligation, the DEA has been required to take administrative action against Defendant Distributors to force compliance. The United States Department of Justice, Office of the Inspector General, Evaluation and Inspections Division. reported that the DEA issued final decisions in 178 registrant actions between 2008 and 2012. The Office of Administrative Law Judges issued a recommended decision in a total of 117 registrant actions before the DEA issued its final decision. including 76 actions involving orders

36

1  to show cause and 41 actions involving immediate suspension orders.[2] Some of these actions

2  include the following:

3

4       (a)     On April 24, 2007, the DEA issued *an Order to Show Cause and*
        *Immediate Suspension Order* against the AmerisourceBergen Orlando, Florida
5       distribution center ("Orlando Facility") alleging failure to maintain effective controls
        against diversion of controlled substances. On June 22, 2007, AmerisourceBergen entered
6       into a settlement which resulted in the suspension of its DEA registration;

7       (b)     On November 28, 2007, the DEA issued an *Order to Show Cause and*
        *immediate Suspension Order* against the Cardinal Health Auburn, Washington
8       Distribution Center ("Auburn Facility") for failure to maintain effective controls against
9       diversion of hydrocodone;

10      (c)     On December 5, 2007, the DEA issued an *Order to Show Cause and*
11      *Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution
        Center ("Lakeland Facility") for failure to maintain effective controls against diversion of
12      hydrocodone;

13      (d)     On December 7, 2007, the DEA issued an *Order to Show Cause and*
14      *Immediate Suspension Order* against the Cardinal Health Swedesboro. New Jersey
        Distribution Center ("Swedesboro Facility") for failure to maintain effective controls
15      against diversion of hydrocodone;

16      (e)     On January 30. 2008, the DEA issued an *Order to Show Cause and*
17      *Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution
        Center ("Stafford Facility") for failure to maintain effective controls against diversion of
18      hydrocodone;

19      (f)     On May 2, 2008, McKesson Corporation entered into an *Administrative*
20      *Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson
        would "maintain a compliance program designed to detect and prevent the diversion of
21      controlled substances, inform DEA of suspicious orders required by 21 CFR § 1301.74(b),
22      and follow the procedures established by its Controlled Substance Monitoring Program;"

23      (g)     On September 30, 2008. Cardinal Health entered into a *Settlement and*
        *Release Agreement and Administrative Memorandum of Agreement* with the DEA related
24      to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The
25      document also referenced allegations by the DEA that Cardinal failed to maintain effective
        controls against the diversion of controlled substances at its distribution facilities located
26      in McDonough. Georgia; Valencia. California; and Denver. Colorado;

27      (h)     On February 2, 2012, the DEA issued an *Order to Show Cause and*

28
        ---
        [2] *The Drug Enforcement Administration's Adjudication of Registrant Actions*, United States Department of Justice,
        Office of the Inspector General, Evaluation and Inspections Divisions, 1-2014-003 (May 2014).

                                            37

*Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center for failure to maintain effective controls against diversion of oxycodone;

(i)  On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center;

(j)  On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO. Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL. Landover MD, La Vista NE, Livonia MI, Methuen MA. Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA; and

(k)  On July 11, 2017, Mallinckrodt agreed to pay the DEA $35 million to settle allegations for the company's failure to report suspicious orders of opioids and allegations of faulty record keeping. The investigation originally began in 2011 and federal investigators reportedly found 44,000 violations potentially exposing Mallinckrodt to $2.3 billion in fines.

169.  In another example, on August 9, 2013, the DEA issued an Order to Show Cause for Defendant MASTERS PHARMACEUTICALS, LLC to consider whether to revoke its distributor license for failing to monitor, report, and prevent the distribution of suspicious orders under federal law. *See,* Masters Pharmaceuticals, Inc.; Decision and Order, 80 FR 55418, 55419 (2015). The Order *inter alia* made allegations regarding Masters suspicious distributions of oxycodone to various pharmacies across the country, including 1.7 million dosage units . . . to a pharmacy located in Clark County from January 1, 2009 through November 30, 2010. *Id.* The registration was ultimately revoked and Masters appealed.

170.  On June 30, 2017, the Court of Appeals for the D.C. Circuit issued an order in denying MASTERS PHARMACEUTICAL, INC.'s, Petition for Review seeking to overturn the DEA's revocation of Masters' DEA registration finding that there was substantial evidence which supported revocation because suspicious orders were not investigated.  *See, Masters Pharmaceutical, Inc. v. Drug Enforcement Administration* (No. 15-1335).

171.  Because Defendant Distributors handle such large volumes of controlled substances, and are the first major line of defense in the movement of legal pharmaceutical controlled substances from legitimate channels into the illicit market, it is incumbent on these

38

1  distributors to maintain effective controls to prevent diversion of controlled substances. Should a
2  distributor deviate from these checks and balances, the closed system collapses.

3      172.    The sheer volume of prescription opioids distributed to pharmacies in the City of
4  Henderson, Nevada is excessive for the medical need of the community and facially suspicious.
5  Some red flags are so obvious that no one who engages in the legitimate distribution of controlled
6  substances can reasonably claim ignorance of them.

7      173.    Not only did Defendants fail to maintain effective controls to prevent diversion of
8  controlled substances, they invested time, research, and funds to ensure the supply would be large
9  enough for the excessive demand. Upon information and belief, Janssen created and supplied a
10 more potent strand of poppy that ultimately propped up the excessive, illegitimate, and harmful
11 demand of opioids across the nation and in the City of Henderson, specifically.

12     174.    Over the course of a decade, Defendant Distributors and Pharmacies failed to
13 detect suspicious orders of prescription opioids which Defendants knew or should have known
14 were likely to be delivered and/or diverted into the City of Henderson, Nevada.

15     175.    Defendants ignored the law, paid the fines, and continued to unlawfully fill
16 suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or
17 orders of unusual frequency in the City of Henderson, and/or orders which Defendants knew or
18 should have known were likely to be delivered and/or diverted into the City of Henderson.

19     176.    Defendant Pharmacies must exercise reasonable care under the circumstances.
20 This involves a duty not to create a foreseeable risk of harm to others. Additionally, one who
21 engages in affirmative conduct, and thereafter realizes or should realize that such conduct has
22 created an unreasonable risk of harm to another, is under a duty to exercise reasonable care to
23 prevent the threatened harm.

24     177.    Like Defendant Distributors, Defendant Pharmacies also serve as gatekeepers in
25 keeping drugs from entering the illicit market. As the "last line of defense," they are meant to be
26 the drug experts in the healthcare delivery system and as such have considerable duties and
27 responsibility in the oversight of patient care. They cannot blindly fill prescriptions written by a
28 doctor if the prescription is not for a legitimate medical purpose.

1    178.    Therefore, Defendant Pharmacies are required to ensure that prescriptions for

2 controlled substances are valid, and that they are issued for a legitimate medical purpose by

3 practitioners acting in their usual course. But by filling prescriptions of questionable or suspicious

4 origin the Defendant Pharmacies have subsequently breached that duty.

5    179.    Upon information and belief and at all times relevant herein, questionable or

6 suspicious prescriptions issued by Defendant Pharmacies include: (1) prescriptions written by a

7 doctor who writes significantly more prescriptions (or in larger quantities) for controlled

8 substances compared to other practitioners in the area; (2) prescriptions which should last for a

9 month in legitimate use, but are being refilled on a shorter basis; (3) prescriptions for antagonistic

10 drugs, such as depressants and stimulants, at the same time; (4) prescriptions with quantities or

11 dosages that differ from usual medical usage; (5) prescriptions that do not comply with standard

12 abbreviations and/or contain no abbreviations; (6) photocopied prescriptions; and/or (7)

13 prescriptions containing different handwritings.

14    180.    In addition to having common law duties, Defendant Pharmacies have a statutory

15 duty under state law to track and report certain information to the Nevada State Board of

16 Pharmacy. The Nevada State Board of Pharmacy has been licensing and regulating the practices

17 of pharmaceutical wholesalers in Nevada since 1967.

18    181.    State law requires that statements of prior sales ("pedigrees") must be in

19 "electronic form, if the transaction occurs on or after January 1, 2007" as well as when one of two

20 things is true: (1) the selling wholesaler is not an authorized distributor for the manufacturer of

21 the drug, or (2) The selling wholesaler bought the drug from another wholesaler.

22    182.    In addition, the mandatory data to be reported must include, but is not limited to

23 as follows: (a) name, address, telephone number, and Nevada license number of the wholesaler

24 making the pedigree; (b) name and title of person certifying the pedigree's accuracy; (c) invoice

25 number and date for the transaction of which the pedigree is part; (d) purchase order number and

26 date for the transaction of which the pedigree is part; (e) order number and date (if one) for the

27 transaction of which the pedigree is part;(f) the business name, address, and telephone number

28 of each preceding seller of the drug; (g) the business name, address, and telephone number of the

customer to whom the reporting wholesaler sold the drug; (h) the date of each preceding or

40

1  subsequent sale; (i)  name of the drug; (j)  strength of the drug; (k)  size of the container; and/or
2  (l)  number of containers.

3      183.    Because  Defendant  Pharmacies  handle  such  large  volumes  of  controlled
4  substances, and are a last line of defense in the movement of legal pharmaceutical controlled
5  substances from legitimate channels into the illicit market, it is incumbent on these Defendants to
6  maintain effective controls to prevent diversion of controlled substances. Should Defendants
7  deviate from these checks and balances, the closed system collapses.

8      184.    For instance, on August 9, 2013, the DEA issued an Order to Show Cause for
9  Defendant MASTERS PHARMACEUTICALS, LLC to consider whether to revoke its distributor
10 license for failing to monitor, report, and prevent the distribution of suspicious orders under
11 federal law. *See,* Masters Pharmaceuticals, Inc.; Decision and Order, 80 FR 55418, 55419 (2015).
12 The Order *inter alia* made allegations regarding Masters suspicious distributions of oxycodone
13 to various pharmacies across the country, including 1.7 million dosage units . . . to a pharmacy
14 located in Clark County, LAM'S PHARMACY, from January 1, 2009 through November 30,
15 2010. *Id.*

16     185.    The sheer volume of prescription opioids distributed to pharmacies in the City of
17 Henderson, Nevada, is excessive for the medical need of the community and facially suspicious.
18 Some red flags are so obvious that no one who engages in the legitimate distribution of controlled
19 substances can reasonably claim ignorance of them.

20     186.    Over the course of a decade, Defendant Pharmacies failed to detect suspicious
21 orders of prescription opioids which Defendants knew or should have known were likely to be
22 delivered and/or diverted into the City of Henderson, Nevada.

23     187.    Yet, Defendants ignored the law, paid the fines, and continued to unlawfully fill
24 suspicious orders of unusual size, orders deviating substantially from a normal pattern and/or
25 orders of unusual frequency in the City of Henderson, Nevada, and/or orders which Defendants
26 knew or should have known were likely to be delivered and/or diverted into the City of
27 Henderson, Nevada.

28

41

1      188.    Additionally, PMBs were gate keepers with the duty to prevent the flood of opioids
2  into the market. Instead of fulfilling their duties to Henderson residents, these Defendants further
3  exacerbated the flood of opioids into the market.

4      189.    Pharmacy Benefit Managers (PBMs) are companies that administer prescription
5  drug plans for entities that include insurers, self-insured employers, and state and federal
6  government agencies (collectively, these entities are referred to as "plan sponsors"). PBMs
7  review and pay claims; PBMs also review and decide the medications that are most effective for
8  any given therapeutic use. In effect, a PBM's plan can determine what medications will (or will
9  not) be available, at what quantity, and how difficult it may be for a prescriber to receive that
10  medication (e.g., by requiring pre-authorization).

11      190.    In essence, because PBMs choose which drugs appear on their formularies, they
12  wield significant influence over which drugs are disseminated throughout Plaintiffs' communities
13  and how those drugs are paid for.

14      191.    Upon information and belief, PBM Defendants colluded with manufacturers who
15  offer financial incentives, such as rebates and administrative fees, in exchange for benefit plan
16  design, formulary placement, and drug utilization management that would result in more opioids
17  entering the marketplace. PBMs earnings were maximized when manufacturers charged high list
18  prices then paid large rebates and discounts to lower the actual price of the transaction.

19      192.    In addition to rebates, PBMs negotiate the payment of administrative fees, volume
20  bonuses and other forms of consideration from manufacturers. The PBMs' ability to negotiate
21  these incentives from drug manufacturers derives from their control of the factors driving
22  utilization, including formulary development and plan design.

23      193.    PBMs require, and receive, incentives from Manufacturer Defendants to keep
24  certain drugs on and off formularies.

25      194.    These incentives include the payment of rebates by Manufacturer Defendants to
26  PBMs based on utilization, bonuses for moving product and hitting volume targets, and the
27  payment of lucrative administrative fees to maximize PBM profits. Much of this activity is not
28  transparent to anyone, including those who in good faith hire PBMs to manage their benefits.

1     195.   Upon information and belief, when PBMs were asked by their clients to implement
2 greater safeguards that limited access to opioids, PBMs refused. Instead, the PBMs opted to
3 receive lucrative rebates from drug manufacturers in exchange for making the manufacturers'
4 prescription opioids as available and accessible as possible.

5     196.   By placing prescription opioids on their formularies and declining to impose
6 appropriate limits on approval for its use, the PBM Defendants facilitated the proliferation and
7 subsequent diversion of prescription opioids throughout Nevada and within the City of
8 Henderson, Nevada, in particular.

9     197.   Upon information and belief, the practice of negotiating certain rebate
10 percentages, maintaining opioids on a certain tier, lowering co-pays, and preventing prior
11 authorizations was prevalent for all PBM Defendants and Manufacturer Defendants. This
12 practice was consistent nationwide: manufacturers provide financial incentives and, in return, the
13 PBM Defendants agreed to make certain prescription opioids available without prior
14 authorization and with low copayments.

15     198.   PBMs' complicity in the overall fraudulent scheme is knowing and purposeful.
16 Manufacturers compete for PBM formulary placement (preferred placement results in greater
17 utilization and greater profits) and pay PBMs incentives to avoid pre-authorization requirements
18 and other hurdles that would slow down flow. Upon information and belief, the defendant PBM
19 formularies include the majority of the opioids at issue in this case, often in preferred tiers, without
20 quantity limits or prior authorization requirements.

21     199.   Moreover, at the same time that PBMs made it easier to obtain prescription
22 opioids, they made it more difficult to receive treatment for addiction.

23    **D. Opioid Addiction in Nevada**

24     200.   In Nevada, the opioid epidemic is widespread, not localized to only one particular
25 city or county. In 2016, Nevada was ranked as the sixth highest state for the number of milligrams
26 of opioids distributed per adult according to a study by the DEA. From 2009 to 2013, hospitals
27 across the State had patients presenting to emergency rooms for heroin or opioid dependence,
28 abuse, or poisoning. Of those visits, 71% occurred in Clark County, encompassing the City of
Henderson, Nevada.

Heroin or Opioid Dependence, Abuse, or Poisoning
Among Hospital Emergency Department Visitors for
Nevada Residents in 2009-2013 by Region



- Carson City and Douglas
- Elko, White Pine, and Eureka
- Churchill, Humboldt, Pershing, and Lander
- Lyon, Mineral, and Storey
- Nye, Esmeralda, and Lincoln
- Washoe
- Clark

201. According to data from the Nevada Division of Public and Behavioral Health, the total number of opioid-related hospitalizations in Nevada nearly doubled from 2010 to 2015. In 2010, the number of opioid-related emergency room hospitalizations in Nevada totaled about 4,518 patients. By comparison, that number rose steeply to about 8,231 visits in a mere five years. Similarly, in 2010, the number of opioid-related inpatient admissions statewide totaled 3,095 hospitalizations. However, in a span of only five years, that number exponentially increased to 7,035 visits in 2015. From 2010 to 2015, over 26% of opioid-related emergency room hospitalizations in Nevada were among patients aged 55 years and older. Over 36% of opioid-related inpatient admissions in the State were among that same age group.

202. Opioid-induced hospitalizations and emergency room visits are a significant area of health expenditure. For instance in 2012, over $40 million was billed for opioid-induced hospitalizations and over $7 million for similar emergency room visits in Southern Nevada alone.

44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18



19

20
203. In addition to hospitalizations, the total number of opioid-related deaths continues
to mount. According to the Centers for Disease Control, nearly half of all U.S. opioid overdose
deaths involve a prescription opioid. In 2015, more than 15,000 people in the U.S. died from
overdoses involving prescription opioids.

21
22
23

24
204. Nevada has the fourth highest drug overdose mortality rate in the United States.
From 2010 to 2015, approximately 2,800 deaths in Nevada have been attributed to opioid-related
overdose. It is estimated that 55% of those deaths were caused by natural and semi-synthetic
opioids.

25
26
27
28

45



Opioid-Related Overdose Deaths, Nevada Residents, 2010-2015*

## E. The Consequences of Defendants' Fraudulent Scheme

205.    Through direct promotional marketing, in conjunction with third-party Front Groups and KOLs, Defendants accomplished exactly what they set out to do: change the institutional and public perception of the risk-benefit assessments and standard of care for treating patients with chronic pain.  As a result, Nevada doctors began prescribing opioids long-term to treat chronic pain - something most would never have considered prior to Defendants' extensive marketing campaign.

206.    But for the misleading information disseminated by Defendants, prescribing physicians would not, in most instances, have prescribed opioids as medically necessary or reasonably required to address chronic pain.  The impact of Defendants' fraudulent marketing on doctors' prescribing and patients' use of opioids is evidenced by the increase in opioid prescribing nationally in concert with Defendants' marketing, and the consequences of opioid over-prescription - including addiction, overdose, and death.

## F. Prescription Opioids Fueling Secondary Market of Illegal Drugs

207.    All Defendants were, at all relevant times hereto, pursuant to NRS 453.400, required to establish and maintain effective controls and procedures to prevent or guard against theft and misuse of controlled substances.  Defendants failed to comply with Nevada law, thus breaching their duties as set forth in the law, and causing the influx of opioids into the market in the City of Las Vegas.

208.    Defendants' successful efforts in expanding the market for opioids to new patients and chronic conditions has created an abundance of drugs available for criminal use and fueled a new wave of addiction and abuse. Defendants' behavior supplies both ends of the secondary market for opioids – producing both the inventory of narcotics to sell and the addicts to buy them. It has been estimated that the majority of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.  Because heroin is cheaper than prescription painkillers, many

46

1 prescription opioid addicts migrate to heroin. Thus, prescription drug abuse is fueling the rise of
2 heroin usage in the City of Henderson, Nevada.

3   209.   As a result, self-reported heroin use nearly doubled in the U.S. between 2007 and
4 2012, from 373,000 to 669,000 individuals and, in 2010, more than 3,000 people in the U.S. died
5 from heroin overdoses, also nearly double the rate in 2006; nearly 80% of those who used heroin
6 in the past year previously abused prescription opioids.



18   210.   While the use of opioids continues to take an enormous toll on the City of
19 Henderson, Nevada, and its residents, pharmaceutical companies reap blockbuster profits.

20   211.   In 2014 alone, opioids generated $11 billion in revenue for drug companies,
21 Defendants experienced a material increase in sales, revenue, and profits from their fraudulent
22 advertising and other unlawful and unfair conduct as described above.

23   212.   Defendants should be held accountable for their misrepresentations and the harms
24 caused to the City of Henderson, Nevada, as well as its residents thus giving rise to this lawsuit.

25 **FIRST CAUSE OF ACTION**

26 *(Public Nuisance Against All Defendants)*

27   213.   Plaintiff repeats and reiterates the allegations previously set forth herein.

28   214.   This action is brought by the City of Henderson, Nevada, for violations of statutory
provisions concerning public nuisance under NRS 202 *et seq.* Nevada law provides that a where

47

1    a controlled substance, including but not limited to opioids, is "unlawfully sold, served, stored,
2    kept, manufactured, used or given away" constitutes a public nuisance.

3    215.    The public nuisance created by Defendants' actions is substantial and
4    unreasonable. It has caused, and continues to cause, significant harm to the community. The rates
5    of opioid use resulting from Defendants' deceptive marketing efforts have caused harm to the
6    community

7    216.    As a result of Defendants' conduct, Plaintiff has incurred substantial costs
8    including but not limited to law enforcement action opioid-related to drug crimes, for addiction
9    treatment, and other services necessary for the treatment of people addicted to prescription
10   opioids.

11   217.    Defendants, and each of them, have contributed to, and/or assisted in creating and
12   maintaining a condition that is harmful to the health of Henderson citizens, "renders a
13   considerable number of persons insecure in life" and/or interferes with the comfortable enjoyment
14   of life in violation of Nevada law.

15   218.    Defendants knew or should have known that their marketing of opioid use would
16   create a public nuisance.

17   219.    Defendants' actions were, and continue to be, a substantial factor in opioids
18   becoming widely available and widely used. Defendants' actions were, and continue to be, a
19   substantial factor in prescribing physicians and prospective patients not accurately assessing and
20   weighing the risks and benefits of opioids for chronic pain. Without Defendants' actions, opioid
21   use would not have become so widespread, and the enormous public health hazard of opioid
22   overuse, abuse, and addiction that now exists would have been averted.

23   220.    The health and safety of the citizens of Henderson, including those who use, have
24   used or will use opioids, as well as those affected by users of opioids, is a matter of great public
25   interest and of legitimate concern.

26   221.    Defendants' conduct has affected and continues to affect a considerable number
27   of people within the physical boundaries of the City of Henderson and is likely to continue to
28   cause significant harm to people who take opioids, their families, and the community at large.

48

1    222.    Defendants' conduct constitutes a public nuisance and, if unabated, will continue
2  to threaten the health, safety and welfare of Henderson residents, creating an atmosphere of fear
3  and addiction that tears at the residents' sense of well-being and security. The City of Henderson,
4  Nevada, has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

5    223.    Defendants created an absolute nuisance. Defendants' actions created and
6  expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated
7  plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health
8  and safety that diversion of opioids would create in Henderson, however, Defendants intentionally
9  and/or unlawfully failed to maintain effective controls against diversion through proper
10  monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally
11  and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or
12  taking other measures to maintain effective controls against diversion. Defendants intentionally
13  and/or unlawfully continued to ship and failed to halt suspicious orders of opioids. Such actions
14  were inherently dangerous.

15    224.    Defendants knew the prescription opioids have a high likelihood of being diverted.
16  It was foreseeable to Defendants that where Defendants distributed prescription opioids without
17  maintain effective controls against diversion, including monitoring, reporting, and refusing
18  shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse
19  nuisance in the City of Henderson, Nevada.

20    225.    Defendants' actions also created a qualified nuisance. Defendants acted recklessly,
21  negligently and/or carelessly, in breach of their duties to maintain effective controls against
22  diversion, thereby creating an unreasonable risk of harm.

23    226.    Defendants acted with actual malice because Defendants acted with a conscious
24  disregard for the rights and safety of other persons, and said actions have a great probability of
25  causing substantial harm.

26    227.    The damages available to the Plaintiff include, inter alia, recoupment of
27  governmental costs, flowing from an "ongoing and persistent" public nuisance which the
28  government seeks to abate.

49

228. Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

229. As a direct result of Defendants' conduct, the City of Henderson, Nevada has suffered actual injury and damages including, but not limited to, significant expenses for police, fire, health, prosecution, corrections and other services. The City of Henderson here seeks recovery for its own harm.

230. The City of Henderson, Nevada has sustained specific and special injuries because its damages include, *inter alia,* health services, law enforcement expenditures, costs related to opioid addiction treatment and overdose prevention, and related costs.

231. The City of Henderson further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference with a right common to the public.

232. The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of prescription opioid abuse and heroin use resulting from Defendants' abdication of their gate-keeping duties has caused harm to the entire community that includes, but is not limited to:

    a. The high rates of use have led to unnecessary opioid abuse, addiction, overdose, injuries, and deaths.

    b. Nor have children escaped the opioid epidemic unscathed. Easy access to prescription opioids has made opioids a recreational drug of choice among teenagers; opioid use among teenagers is only outpaced by marijuana use. Even infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts.

    c. Even those residents who have never taken opioids have suffered from the public nuisance arising from Defendants' abdication of their gate-keeper duties. Many have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other

50

1               support from family members who have used, abused, become addicted to,

2               overdosed on, or been killed by opioids.

3         d. The opioid epidemic has increased health care costs.

4         e. Employers have lost the value of productive and healthy employees.

5         f. Defendants' failure to maintain effective controls against diversion of dangerously

6               addictive prescription opioids for non-medical use and abuses has created an

7               abundance of drugs available for criminal use and fueled a new wave of addiction,

8               abuse, and injury.

9         g. Defendants' dereliction of duties resulted in a diverted supply of narcotics to sell,

10              and the ensuing demand of addicts to buy them. Increased supply, due to

11              Defendants' conduct, led to more addiction, with many addicts turning from

12              prescription opioids to heroin. People addicted to opioids frequently require

13              increasing levels of opioids, and many turned to heroin as a foreseeable result.

14         h. The diversion of opioids into the secondary, criminal market and the increase in

15              the number of individuals who abuse or are addicted to opioids has increased the

16              demands on health care services and law enforcement in the City of Henderson.

17         i. The significant unreasonable interference with the public rights caused by

18              Defendants' conduct has taxed the human, medical, public health, law

19              enforcement, and financial resources of City of Henderson.

20         j. Defendants' interference with the comfortable enjoyment of life in Henderson is

21              unreasonable because any potential value is outweighed by the gravity of the harm

22              inflicted by Defendants' actions.

23       233. Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia*

24 abatement, compensatory damages, and punitive damages from the Defendant Wholesale

25 Distributors for the creation of a public nuisance, attorney fees and costs, and pre- and post-

26 judgment interest.

27       234. The continued tortious conduct by the Defendants causes a repeated or continuous

28 injury. The damages have not occurred all at once but have increased as time progresses. The tort

51

1   is not completed nor have all the damages been incurred until the wrongdoing ceases. The

2   wrongdoing has not ceased. The public nuisance remains unabated.

3       235.    Therefore, Plaintiff's claims are subject to equitable tolling, stemming from

4   Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information

5   underlying its claims.

6       236.    That Plaintiff has been required to prosecute this action and is entitled to attorneys'

7   fees and costs as provided by Nevada statute.

8       237.    That Plaintiff's general, special and punitive damages are in amounts in excess of

9   $15,000.00.

10   ## SECOND CAUSE OF ACTION

11   *(Common Law Public Nuisance against all Defendants)*

12       238.    Plaintiff repeats and reiterates the allegations previously set forth herein.

13       239.    Defendants, each of them, have contributed to, and/or assisted in creating and

14   maintaining a condition that is harmful to the health of Henderson citizens or interferes with the

15   comfortable enjoyment of life.

16       240.    The public nuisance created by Defendants' actions is substantial and

17   unreasonable. It has caused and continues to cause significant harm to the community and the

18   harm inflicted outweighs any offsetting benefit. The staggering rates of opioid use resulting from

19   Defendants' marketing efforts have caused harm to the community.

20       241.    Defendants, and each of them, knew or should have known that their promotion of

21   opioid use would create a public nuisance.

22       242.    Defendants' actions were, at the least, a substantial factor in opioids becoming

23   widely available and widely used.

24       243.    Defendants' actions were, at the least, a substantial factor in doctors and patients

25   not accurately assessing and weighing the risks and benefits of opioids for chronic pain.

26       244.    Without Defendants' actions, opioid use would not have become so widespread,

27   and the enormous public health hazard of opioid overuse, abuse, and addiction that now exists

28   would have been averted.

52

1    245.   The health and safety of those individuals in the City of Henderson, including
2  those who use, have used or will use opioids, as well as those affected by users of opioids, is a
3  matter of great public interest and of legitimate concern.

4    246.   The public nuisance created, perpetuated, and maintained by Defendants can be
5  abated and further reoccurrence of such harm and inconvenience can be prevented.

6    247.   Defendants' conduct has affected and continues to affect a considerable number
7  of people within the City of Henderson and is likely to continue to cause significant harm to
8  chronic pain patients who take opioids, their families, and the community at large.

9    248.   That at all times hereinafter mentioned, upon information and belief, the above-
10  described culpable conduct by Defendants was a proximate cause of injuries sustained by
11  Plaintiff.

12    249.   That as a result of the aforesaid occurrence, Plaintiff has suffered extensive
13  monetary and pecuniary losses and other compensatory damages were also incurred and paid,
14  including necessary medical, hospital, and concomitant expenses.

15    250.   Defendants' conduct constitutes a public nuisance and, if unabated, will continue
16  to threaten the health, safety and welfare of the City of Henderson's residents, creating an
17  atmosphere of fear and addiction that tears at the residents' sense of well-being and security. The
18  City of Henderson has a clearly ascertainable right to abate conduct that perpetuates this nuisance.

19    251.   Defendants created an absolute nuisance. Defendants' actions created and
20  expanded the abuse of opioids, which are dangerously addictive, and the ensuing associated
21  plague of prescription opioid and heroin addiction. Defendants knew the dangers to public health
22  and safety that diversion of opioids would create in Henderson, however, Defendants intentionally
23  and/or unlawfully failed to maintain effective controls against diversion through proper
24  monitoring, reporting and refusal to fill suspicious orders of opioids. Defendants intentionally
25  and/or unlawfully distributed opioids without reporting or refusing to fill suspicious orders or
26  taking other measures to maintain effective controls against diversion. Defendants intentionally
27  and/or unlawfully continued to ship and failed to halt suspicious orders of opioids. Such actions
28  were inherently dangerous.

53

252. Defendants knew the prescription opioids have a high likelihood of being diverted. It was foreseeable to Defendants that where Defendants distributed prescription opioids without maintain effective controls against diversion, including monitoring, reporting, and refusing shipment of suspicious orders, that the opioids would be diverted, and create an opioid abuse nuisance in the City of Henderson.

253. Defendants' actions also created a qualified nuisance. Defendants acted recklessly, negligently and/or carelessly, in breach of their duties to maintain effective controls against diversion, thereby creating an unreasonable risk of harm.

254. Defendants acted with actual malice because Defendants acted with a conscious disregard for the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

255. The damages available to the Plaintiff include, inter alia, recoupment of governmental costs, flowing from an "ongoing and persistent" public nuisance which the government seeks to abate. Defendants' conduct is ongoing and persistent, and the Plaintiff seeks all damages flowing from Defendants' conduct. Plaintiff further seeks to abate the nuisance and harm created by Defendants' conduct.

256. As a direct result of Defendants' conduct, the City of Henderson has suffered actual injury and damages including, but not limited to, significant expenses for police, emergency, health, prosecution, corrections and other services. The City of Henderson here seeks recovery for its own harm.

257. The City of Henderson has sustained specific and special injuries because its damages include, *inter alia,* health services, law enforcement expenditures, costs related to opioid addiction treatment and overdose prevention, and related costs.

258. The City of Henderson further seeks to abate the nuisance created by the Defendants' unreasonable, unlawful, intentional, ongoing, continuing, and persistent interference with a right common to the public.

259. The public nuisance created by Defendants' actions is substantial and unreasonable – it has caused and continues to cause significant harm to the community, and the harm inflicted outweighs any offsetting benefit. The staggering rates of prescription opioid abuse

54

1 | and heroin use resulting from Defendants' abdication of their gate-keeping duties has caused harm
2 | to the entire community that includes, but is not limited to:

3 |     a. The high rates of use have led to unnecessary opioid abuse, addiction, overdose,
4 |        injuries, and deaths.

5 |     b. Nor have children escaped the opioid epidemic unscathed. Easy access to
6 |        prescription opioids has made opioids a recreational drug of choice among
7 |        Henderson teenagers; opioid use among teenagers is only outpaced by marijuana
8 |        use. Even infants have been born addicted to opioids due to prenatal exposure,
9 |        causing severe withdrawal symptoms and lasting developmental impacts.

10 |     c. Even those Henderson residents who have never taken opioids have suffered from
11 |        the public nuisance arising from Defendants' abdication of their gate-keeper
12 |        duties. Many have endured both the emotional and financial costs of caring for
13 |        loved ones addicted to or injured by opioids, and the loss of companionship,
14 |        wages, or other support from family members who have used, abused, become
15 |        addicted to, overdosed on, or been killed by opioids.

16 |     d. The opioid epidemic has increased health care costs.

17 |     e. Employers have lost the value of productive and healthy employees.

18 |     f. Defendants' failure to maintain effective controls against diversion of dangerously
19 |        addictive prescription opioids for non-medical use and abuses has created an
20 |        abundance of drugs available for criminal use and fueled a new wave of addiction,
21 |        abuse, and injury.

22 |     g. Defendants' dereliction of duties resulted in a diverted supply of narcotics to sell,
23 |        and the ensuing demand of addicts to buy them. Increased supply, due to
24 |        Defendants' conduct, led to more addiction, with many addicts turning from
25 |        prescription opioids to heroin. People addicted to opioids frequently require
26 |        increasing levels of opioids, and many turned to heroin as a foreseeable result.

27 |     h. The diversion of opioids into the secondary, criminal market and the increase in
28 |        the number of individuals who abuse or are addicted to opioids has increased the
       demands on health care services and law enforcement in the City of Henderson.

1           i. The significant unreasonable interference with the public rights caused by

2                Defendants' conduct has taxed the human, medical, public health, law

3                enforcement, and financial resources of City of Henderson.

4           j. Defendants' interference with the comfortable enjoyment of life in City of

5                Henderson is unreasonable because any potential value is outweighed by the

6                gravity of the harm inflicted by Defendants' actions.

7        260. Plaintiff seeks all legal and equitable relief as allowed by law, including *inter alia*

8 abatement, compensatory damages, and punitive damages from the Defendant Wholesale

9 Distributors for the creation of a public nuisance, attorney fees and costs, and pre- and post-

10 judgment interest.

11        261. The continued tortious conduct by the Defendants causes a repeated or continuous

12 injury. The damages have not occurred all at once but have increased as time progresses. The tort

13 is not completed nor have all the damages been incurred until the wrongdoing ceases. The

14 wrongdoing has not ceased. The public nuisance remains unabated.

15        262. Therefore, Plaintiff's claims are subject to equitable tolling, stemming from

16 Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information

17 underlying its claims.

18        263. That Plaintiff has been required to prosecute this action and is entitled to attorneys'

19 fees and costs as provided by Nevada statute.

20        264. That Plaintiff's general, special and punitive damages are in amounts in excess of

21 $15,000.00.

22 **THIRD CAUSE OF ACTION**

23 *(Negligent Misrepresentation against all Defendants)*

24        265. Plaintiff repeats and reiterates the allegations previously set forth herein.

25        266. Defendants had a duty to exercise reasonable care in the marketing of opioids.

26        267. Defendants were aware of the potentially dangerous situation involving opioids.

27        268. Defendants marketed opioids in an improper manner by:

28

1       a.  overstating the benefits of chronic opioid therapy, promising improvement in

2            patients' function and quality of life, and failing to disclose the lack of evidence

3            supporting long-term use;

4       b.  trivializing or obscuring opioids' serious risks and adverse outcomes, including

5            the risk of addiction, overdose, and death;

6       c.  overstating opioids' superiority compared with other treatments, such as other

7            non-opioid analgesics, physical therapy, and other alternatives;

8       d.  mischaracterizing the difficulty of withdrawal from opioids and the prevalence of

9            withdrawal symptoms; and

10       e.  marketing opioids for indications and benefits that were outside of the opioids'

11            labels and not supported by substantial evidence.

12      269.    It was Defendants' marketing — and not any medical breakthrough— that

13 rationalized prescribing opioids for chronic pain and opened the floodgates of opioid use and

14 abuse. The result has been catastrophic.

15      270.    Defendants disseminated many of their false, misleading, imbalanced, and

16 unsupported statements indirectly, through KOLs and Front Groups, and in unbranded marketing

17 materials. These KOLs and Front Groups were important elements of Defendants' marketing

18 plans, which specifically contemplated their use, because they seemed independent and therefore

19 outside FDA oversight. Through unbranded materials, Defendants, with their own knowledge of

20 the risks, benefits and advantages of opioids, presented information and instructions concerning

21 opioids generally that were contrary to, or at best, inconsistent with information and instructions

22 listed on Defendants' branded marketing materials and drug labels. Defendants did so knowing

23 that unbranded materials typically are not submitted to or reviewed by the FDA.

24      271.    Defendants also marketed opioids through the following vehicles: (a) KOLs, who

25 could be counted upon to write favorable journal articles and deliver supportive CMEs; (b) a body

26 of biased and unsupported scientific literature; (c) treatment guidelines; (d) CMEs; (e) unbranded

27 patient education materials; and (f) Front Group patient-advocacy and professional organizations,

28 which exercised their influence both directly and through Defendant-controlled KOLs who served

in leadership roles in those organizations.

1     272.    Defendants knew or should have known that opioids were unreasonably dangerous
2  and could cause addiction.

3     273.    Defendants' marketing was a factor in physicians, patients, and others to prescribe
4  or purchase opioids.

5     274.    As a direct and proximate result of Defendants' negligence, Plaintiff has suffered
6  and continues to suffer injury, including but not limited to incurring excessive costs related to
7  diagnosis, treatment, and cure of addiction to opioids, bearing the massive costs of these illnesses
8  and conditions by having to provide necessary resources for response, care, treatment, and law
9  enforcement services for its residents and using Henderson resources in relation to opioid use and
10  abuse.

11     275.    However, Defendants continued to design manufacture, market, distribute and sell
12  opioids so as to maximize sales and profits at the expense of the health and safety of the public,
13  in conscious disregard of the foreseeable harm caused by the opioid drug.

14     276.    Defendants' conduct exhibits such an entire want of care as to establish that their
15  actions were a result of fraud, ill will, recklessness, or willful and intentional disregard of
16  Plaintiff's rights, and, therefore, Plaintiff is entitled to punitive damages.

17     277.    The continued tortious conduct by the Defendants causes a repeated or continuous
18  injury. The damages have not occurred all at once but have increased as time progresses. The tort
19  is not completed nor have all the damages been incurred until the wrongdoing ceases. The
20  wrongdoing has not ceased. The public nuisance remains unabated.

21     278.    Therefore, Plaintiff's claims are subject to equitable tolling, stemming from
22  Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information
23  underlying its claims.

24     279.    That Plaintiff has been required to prosecute this action and is entitled to attorneys'
25  fees and costs as provided by Nevada statute.

26     280.    That Plaintiff's general, special and punitive damages are in amounts in excess of
27  $15,000.00.

28

## FOURTH CAUSE OF ACTION

*(Negligence against Defendant Distributors, Defendant Pharmacies, & Defendant Providers)*

58

1    281.    Plaintiff incorporates the allegations within all prior paragraphs within this
2  || Complaint as if they were fully set forth herein.

3    282.    Defendant Distributors and Pharmacies owed a non-delegable duty to exercise
4  || reasonable care in the distribution and/or sale of opioids.

5    283.    Defendants Distributors and Pharmacies further owe a non-delegable duty to
6  || Plaintiff to conform their behavior to the legal standard of reasonable conduct under the
7  || circumstances, in the light of the apparent risks.

8    284.    Defendant Distributors and Pharmacies breached this duty by failing to take any
9  || action to prevent or reduce the distribution of the opioids.

10    285.    Defendant Providers owed a duty to exercise reasonable care in the prescription of
11  || opioids.

12    286.    Defendant Providers further owe a duty to Plaintiff to conform their behavior to
13  || the legal standard of reasonable conduct under the circumstances, in light of the apparent risks,
14  || and in light of Defendant Providers' knowledge as it relates to the inherent dangers in the use of
15  || opioids.

16    287.    Defendant Providers breached this duty by, not only failing to recognize the risk
17  || of writing increased numbers of prescriptions for opioids, but by actively disregarding the dangers
18  || associated with opioid use, particularly for off-label purposes and in dosages far exceeding those
19  || recommended.

20    288.    Defendant Providers further breached their duty by providing false information to
21  || health insurance providers in order to obtain authorization and coverage for the opioid
22  || prescriptions.

23    289.    As a proximate result, Defendant Distributors and Pharmacies, as well as
24  || Defendant Providers, and their agents have caused Plaintiff to incur significant damages,
25  || including but not limited to costs related to diagnosis, treatment, and cure of addiction or risk of
26  || addiction to opioids. The City of Henderson has borne the massive costs of these illnesses and
27  || conditions by having to provide necessary care, facilities, and services for treatment of Henderson
28  || residents.

59

1    290.    Defendant Distributors and Pharmacies and Defendant Providers were negligent

2  in failing to monitor and guard against third-party misconduct and participated and enabled such

3  misconduct.

4    291.    Defendant Distributors and Pharmacies were negligent in disclosing to Plaintiff

5  suspicious orders for opioids.

6    292.    Defendant Providers were negligent in writing improper prescriptions for opioids.

7    293.    Defendant Distributors and Pharmacies' and Defendant Providers' acts and

8  omissions imposed an unreasonable risk of harm to others separately and/or combined with other

9  Defendants.

10    294.    A negligent violation of this trust poses distinctive and significant dangers to the

11  City of Henderson and its residents from the diversion of opioids for non-legitimate medical

12  purposes and addiction to the same by consumers.

13    295.    Defendant Distributors and Pharmacies and Defendant Providers were negligent

14  in not acquiring and utilizing special knowledge and special skills that relate to the dangerous

15  activity in order to prevent and/or ameliorate such distinctive and significant dangers.

16    296.    Defendant Distributors and Pharmacies are required to exercise a high degree of

17  care and diligence to prevent injury to the public from the diversion of opioids during distribution.

18    297.    Defendant Providers are required to exercise a high degree of care to prescribe

19  appropriate medications in appropriate dosages to avoid harm to patients and their communities.

20    298.    Defendant Distributors and Pharmacies breached their duty to exercise the degree

21  of care, prudence, watchfulness, and vigilance commensurate to the dangers involved in the

22  transaction of its business.

23    299.    Defendant Providers breached their duty to exercise the degree of care required to

24  protect their patients and their communities.

25    300.    Defendant Distributors and Pharmacies are in exclusive control of the distribution

26  management of opioids that it distributed and/or sold in City of Henderson.

27    301.    Defendant Providers were active in providing patients within the City of

28  Henderson with the prescriptions for opioids that were supplied by the Defendant Distributors

and Pharmacies

1    302.   Plaintiff is without fault and the injuries to the City of Henderson and its residents
2  would not have occurred in the ordinary course of events had Defendants used due care
3  commensurate to the dangers involved in the distribution of opioids.

4    303.   The continued tortious conduct by the Defendants causes a repeated or continuous
5  injury. The damages have not occurred all at once but have increased as time progresses. The tort
6  is not completed nor have all the damages been incurred until the wrongdoing ceases. The
7  wrongdoing has not ceased. The public nuisance remains unabated.

8    304.   Therefore, Plaintiff's claims are subject to equitable tolling, stemming from
9  Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information
10 underlying its claims.

11   305.   That Plaintiff has been required to prosecute this action and is entitled to attorneys'
12 fees and costs as provided by Nevada statute.

13   306.   That Plaintiff's general, special and punitive damages are in amounts in excess of
14 $15,000.00.

15                          **FIFTH CAUSE OF ACTION**

16                    *(Unjust Enrichment against all Defendants)*

17
18   307.   Plaintiff has expended substantial amounts of money to fix or mitigate the societal
19 harms caused by Defendants' conduct.

20   308.   The expenditures by Plaintiff in providing healthcare services to people who use
21 opioids have added to Defendants' wealth. These expenditures have helped sustain Defendants'
22 businesses.

23   309.   Plaintiff has conferred a benefit upon Defendants, by paying for what may be
24 called Defendants' externalities—the costs of the harm caused by Defendants' negligent
25 distribution and sales practices.

26   310.   Defendants are aware of this obvious benefit, and that retention of this benefit is
27 unjust.

28   311.   Defendants made substantial profits while fueling the prescription drug epidemic
into the City of Henderson.

61

1    312.    Defendants continue to receive considerable profits from the distribution of
2  controlled substances into the City of Henderson.

3    313.    Defendants have been unjustly enriched by their negligent, malicious, oppressive,
4  illegal and unethical acts, omissions, and wrongdoing.

5    314.    It would be inequitable to allow Defendants to retain benefit or financial
6  advantage.

7    315.    Plaintiff demands judgment against each Defendant for restitution, disgorgement,
8  and any other relief allowed in law or equity.

9    316.    Plaintiff is without fault and the injuries to the City of Henderson and its residents
10  would not have occurred in the ordinary course of events had Defendants used due care
11  commensurate to the dangers involved in the distribution of opioids.

12    317.    The continued tortious conduct by the Defendants causes a repeated or continuous
13  injury. The damages have not occurred all at once but have increased as time progresses. The tort
14  is not completed nor have all the damages been incurred until the wrongdoing ceases. The
15  wrongdoing has not ceased. The public nuisance remains unabated.

16    318.    Therefore, Plaintiff's claims are subject to equitable tolling, stemming from
17  Defendants' wrongful concealment and from Plaintiff's inability to obtain vital information
18  underlying its claims.

19    319.    That Plaintiff has been required to prosecute this action and is entitled to attorneys'
20  fees and costs as provided by Nevada statute.

21    320.    That Plaintiff's general, special and punitive damages are in amounts in excess of
22  $15,000.00.

23                                **SIXTH CAUSE OF ACTION**
24       *(Violation of the Nevada Racketeering Act against Defendants Purdue and the Sackler
25       Defendants, Endo, Mallinckrodt, Actavis, McKesson, Cardinal, Amerisourcebergen, and*
                                      *Express Scripts)*
26
27    321.    The City of Henderson, both as a "person" who has sustained injury *and* on behalf
28  of Henderson citizens who have been injured, brings this claim for civil remedies under the
     Racketeering Act, NRS §§ 207.350 to 207.520, against the following Defendants, as defined

1  above: Purdue and the Sackler Defendants, Endo, Mallinckrodt, Actavis, McKesson, Cardinal,
2  AmerisourceBergen, and Express Scripts (collectively, for purposes of this Count, the
3  "Racketeering Defendants").

4      322. The Racketeering Defendants conducted and continue to conduct their business
5  through legitimate and illegitimate means in the form of a criminal syndicate or enterprise as
6  defined by NRS §§ 207.370 and 207.380. At all relevant times, the Racketeering Defendants were
7  "persons" under NRS § 0.039 and are included in the definition stating that a person is "any form
8  of business or social organization...including, but not limited to, a corporation, partnership,
9  association, trust or unincorporated organization."

10     323. Section 207.400 of the Racketeering Act makes it unlawful "for a
11 person....employed by or associated with any enterprise to conduct or participate, directly or
12 indirectly, in: (1) The affairs of the enterprise through racketeering activity; or (2) Racketeering
13 activity through the affairs of the enterprise." NRS § 207.400(1)(c).

14     324. The term "enterprise" is defined as including a "sole proprietorship, partnership,
15 corporation, business trust or other legal entity" as well as a "union, association or other group of
16 persons associated in fact although not a legal entity." The definition includes "illicit as well as
17 licit enterprises and governmental as well as other entities." NRS § 207.380.

18     329. For over a decade, the Racketeering Defendants aggressively sought to bolster their
19 revenue, increase profit, and grow their share of the prescription painkiller market by unlawfully
20 and surreptitiously increasing the volume of opioids they sold. However, the Racketeering
21 Defendants are not permitted to engage in a limitless expansion of their market through the
22 unlawful sales of regulated painkillers. As "registrants," the Racketeering Defendants operated
23 and continue to operate within the nationwide "closed-system" created under the Controlled
24 Substances Act, 21 USC § 821, *et seq.* (the "CSA") and the Nevada Controlled Substances Act,
25 §§ 453.005 to 453.730. Together, the CSA and Nevada Controlled Substances Act restrict the
26 Racketeering Defendants' ability to manufacture or distribute Schedule II substances like opioids
27 nationally and in the City of Henderson by requiring them to: (1) register to manufacture or
28 distribute opioids; (2) maintain effective controls against diversion of the controlled substances
   that they manufacturer or distribute; (3) design and operate a system to identify suspicious orders

1    of controlled substances, halt such unlawful sales, and report them to the DEA, the Nevada
2    Pharmacy Board, and the FDA; and (4) make sales within a limited quota set by the DEA for the
3    overall production of Schedule II substances like opioids.

4    330.    The nationwide closed-system, including the establishment of quotas, was
5    specifically intended to reduce or eliminate the diversion of Schedule II substances like opioids
6    from "legitimate channels of trade" to the illicit market by controlling the quantities of the basic
7    ingredients needed for the manufacture of [controlled substances]."[3]

8    331.    Finding it impossible to legally achieve their ever increasing sales ambitions,
9    members of the Opioid Diversion Enterprise (as defined below) systematically and fraudulently
10   violated their duty under Nevada law to maintain effective controls against diversion of their
11   drugs, to design and operate a system to identify suspicious orders of their drugs, to halt unlawful
12   sales of suspicious orders, and to notify the DEA, the Nevada Board of Pharmacy, and the FDA
13   of suspicious orders.[4] As discussed in detail below, through the Racketeering Defendants'
14   scheme, members of the Opioid Diversion Enterprise repeatedly engaged in unlawful sales of
15   painkillers which, in turn, artificially and illegally increased the annual production quotas
16   throughout the United States for opioids allowed by the DEA. In doing so, the Racketeering
17   Defendants allowed hundreds of millions of pills to enter the illicit market which allowed them
18   to generate obscene profits.

19   332.    Defendants' illegal scheme was hatched by an association-in-fact enterprise
20   between the Manufacturer Defendants and the Distributor Defendants, and executed in perfect
21   harmony by each of them. In particular, each of the Racketeering Defendants were associated with,
22   and conducted or participated in, the affairs of the racketeering enterprise (defined below and
23   referred to collectively as the "Opioid Diversion Enterprise"), whose purpose was to engage in
24   the unlawful sales of opioids, and to deceive the public, and federal and state regulators into
25   believing that the Racketeering Defendants were faithfully fulfilling their statutory obligations.
26   The Racketeering Defendants' scheme allowed them to make billions in unlawful sales of opioids

27
28   [3] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International
     Narcotics Control, United States Senate, May 5, 2015 (available at
     https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
     [4] 21 USC § 823(a)(1), (b)(1); 21 CFR § 1301.74(b)-(c).

64

1    and, in turn, increase and/or maintain high production quotas with the purpose of ensuring
2    unlawfully increasing revenues, profits, and market share. As a direct result of the Racketeering
3    Defendants' fraudulent scheme, course of conduct, and pattern of racketeering activity, they were
4    able to extract billions of dollars of revenue from the addicted American public, while entities
5    like the City of Henderson, Nevada experienced tens of millions of dollars of injury caused by the
6    reasonably foreseeable consequences of the prescription opioid addiction epidemic. As explained
7    in detail below, the Racketeering Defendants' misconduct violated § 207.400 of the Racketeering
8    Act and Plaintiff is entitled to treble damages for its injuries under NRS § 207.410.

9         333.    Alternatively, the Racketeering Defendants were members of a legal entity
10   enterprise within the meaning of NRS § 207.380 through which the Racketeering Defendants
11   conducted their pattern of racketeering activity in the City of Henderson and throughout the
12   United States. Specifically, the Healthcare Distribution Alliance (the "HDA")[5] is a distinct legal
13   entity that satisfies the definition of a racketeering enterprise. The HDA is a non-profit corporation
14   formed under the laws of the District of Columbia and doing business in Virginia. As a non-profit
15   corporation, HDA qualifies as an "enterprise" within the definition set out in § 207.380 because
16   it is a corporation and a legal entity.

17        334.    On information and belief, each of the Racketeering Defendants is a member,
18   participant, and/or sponsor of the HDA and utilized the HDA to conduct the Opioid Diversion
19   Enterprise and to engage in the pattern of racketeering activity that gives rise to the Count.

20        335.    Each of the Racketeering Defendants is a legal entity separate and distinct from
21   the HDA. And, the HDA serves the interests of distributors and manufacturers beyond the
22   Racketeering Defendants. Therefore, the HDA exists separately from the Opioid Diversion
23   Enterprise, and each of the Racketeering Defendants exists separately from the HDA. Therefore,
24   the HDA may serve as a racketeering enterprise.

25        336.    The legal and association-in-fact enterprises alleged in the previous and
26   subsequent paragraphs were each used by the Racketeering Defendants to conduct the Opioid
27   Diversion Enterprise by engaging in a pattern of racketeering activity. Therefore, the legal and

28

---

[5] Health Distribution Alliance, History, Health Distribution Alliance, (last accessed on September 15, 2017), https://www.healthcaredistribution.org/about/hda-history.

65

association- in-fact enterprises alleged in the previous and subsequent paragraphs are pleaded in the alternative and are collectively referred to as the "Opioid Diversion Enterprise."

## THE OPIOID DIVERSION ENTERPRISE

337. Throughout the United States—and within the City of Henderson, Nevada—the Racketeering Defendants have operated at all relevant times under a "closed distribution system" of quotas that governs the production and distribution of prescription opioid drugs. The Opioids Diversion Enterprise is an ongoing and continuing business organization that created and maintained systemic links for a common purpose: To protect and maximize their profitability under this quota system through the unlawful sale of opioids. The Racketeering Defendants participated in the Opioids Diversion Enterprise through a pattern of racketeering activity, which includes multiple violations of Nevada state criminal law.

338. Recognizing that there is a need for greater scrutiny over controlled substances due to their potential for abuse and danger to public health and safety, the United States Congress enacted the Controlled Substances Act in 1970.[6] The CSA and its implementing regulations created a closed-system of distribution for all controlled substances and listed chemicals.[7] Congress specifically designed the closed chain of distribution to prevent the diversion of legally produced controlled substances into the illicit market.[8] As reflected in comments from United States Senators during deliberation on the CSA, the "[CSA] is designed to crack down hard on the narcotics pusher and the illegal diverters of pep pills and goof balls."[9] Congress was concerned with the diversion of drugs out of legitimate channels of distribution when it enacted the CSA and acted to halt the "widespread diversion of [controlled substances] out of legitimate channels into the illegal market."[10] Moreover, the closed-system was specifically designed to ensure that there are multiple ways of identifying and preventing diversion through active

---

[6] Joseph T. Rannazzisi Decl. ¶4, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, D.D.C. Case No. 12-cv-185 (Document 14-2 February 10, 2012).

[7] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566.

[8] *Gonzalez v. Raich*, 545 U.S. 1, 12-14 (2005); 21 USC § 801(20; 21 USC §§ 821-824, 827, 880; H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572 (Sept. 10, 1970).

[9] *See* H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. at 4566; 116 Cong. Rec. 977-78 (Comments of Sen. Dodd, Jan 23, 1970).

[10] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

66

1  participation by registrants within the drug delivery chain.[11] All registrants – manufacturers and

2  distributors alike – must adhere to the specific security, recordkeeping, monitoring and reporting

3  requirements that are designed to identify or prevent diversion.[12] When registrants at any level

4  fail to fulfill their obligations, the necessary checks and balances collapse.[13] The result is the

5  scourge of addiction that has occurred.

6      339.    Central to the closed-system created by the CSA was the directive that the DEA

7  determine quotas of each basic class of Schedule I and II controlled substances each year. The

8  quota system was intended to reduce or eliminate diversion from "legitimate channels of trade"

9  by controlling the "quantities of the basic ingredients needed for the manufacture of

10 [controlled substances], and the requirement of order forms for all transfers of these drugs."[14]

11 When evaluating production quotas, the DEA was instructed to consider the following

12 information:

13          a.  Information provided by the United States Department of Health and Human
                Services;

14

15          b.  Total net disposal of the basic class by all manufacturers;

16          c.  Trends in the national rate of disposal of the basic class;

17          d.  An applicant's production cycle and current inventory position;

18
            e.  Total actual or estimated inventories of the class and of all substances manufactured
19              from the class and trends in inventory accumulation; and

20
            f.  Other factors such as: changes in the currently accepted medical use of substances
21              manufactured for a basic class; the economic and physical availability of raw
22              materials; yield and sustainability issues; potential disruptions to production; and

23

24 [11] *See* Statement of Joseph T. Rannazzisi before the Caucus on International Narcotics Control United States Senate, July 18, 2012 (available at https://www.justice.gov/sites/default/files/testimonies/witnesses/attachments/07/18/12/07-18-12- dea-rannazzisi.pdf).

25 [12] *Id.*; 16.19.8.13(F) NMAC (requiring anyone licensed to distribute Schedule II controlled substances in Nevada to "report any theft, suspected theft, diversion or other significant loss of any prescription drug or device to the board
26 and where applicable, to the DEA."); 16.19.20.48(A) NMSA ("All applicants and registrants shall provide effective controls and procedures to guard against theft and diversion of controlled substances.").

27 [13] Joseph T. Rannazzisi Decl. ¶ 10, *Cardinal Health, Inc. v. Eric Holder, Jr., Attorney General*, Case No. 12-cv-185 (Document 14-2 February 10, 2012).
28 [14] 1970 U.S.C.C.A.N. 4566 at 5490; *see also* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United States Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).

unforeseen emergencies.[15]

340.    Under the CSA, as incorporated into Nevada law, it is unlawful for a registrant to manufacture a controlled substance in Schedule II, like prescription opioids, that is (1) not expressly authorized by its registration and by a quota assigned to it by DEA, or (2) in excess of a quota assigned to it by the DEA.[16]

341.    At all relevant times, the Racketeering Defendants operated as an enterprise formed for the purpose of unlawfully increasing sales, revenues and profits by disregarding their duty under Nevada law to identify, investigate, halt or report suspicious orders of opioids and diversion of their drugs into the illicit market in order to unlawfully increase the quotas set by the DEA and allow them to collectively benefit from the unlawful formation of a greater pool of prescription opioids from which to profit. The Racketeering Defendants conducted their pattern of racketeering activity in the City of Henderson, Nevada and throughout the United States through this enterprise.

342.    The Racketeering Defendants hid from the general public and suppressed and/or ignored warnings from third parties, whistleblowers and governmental entities, about the reality of the suspicious orders that the Racketeering Defendants were filling on a daily basis -- leading to the diversion of a tens of millions of doses of prescriptions opioids into the illicit market.

343.    The Racketeering Defendants, with knowledge and intent, agreed to the overall objective of their fraudulent scheme and participated in the common course of conduct to commit acts of fraud and illegal trafficking in and distribution of prescription opioids, in violation of Nevada law.

344.    Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants had to agree to implement similar tactics regarding reports and representations about their systems for controlling against diversion, and refusal to report suspicious orders.

---

[15] *See* Testimony of Joseph T. Rannazzisi before the Caucus on International Narcotics Control, United State Senate, May 5, 2015 (available at https://www.drugcaucus.senate.gov/sites/default/files/Rannazzisi%20Testimony_0.pdf).
[16] *Id.* (citing 21 USC 842(b)); NRS § 453.385 (regulations must ensure "compliance with, but may be more stringent than required by, applicable federal law governing controlled substances and the rules, regulations and orders of any federal agency administering such law.")); NRS § 453.146 (the Nevada Board of Pharmacy may consider findings of "the federal Food and Drug Administration or the Drug Enforcement Administration as prima facie evidence relating to one or more of the determinative factors.").

68

345.    The opioid epidemic has its origins in the mid-1990s when, between 1997 and 2007, nationwide per capita purchases of methadone, hydrocodone, and oxycodone increased 13-fold, 4- fold, and 9-fold, respectively. By 2010, enough prescription opioids were sold in the United States to medicate every adult in the county with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[17] On information and belief, the Opioid Diversion Enterprise has been ongoing nationally and in the City of Henderson, Nevada for at least the last decade.[18]

346.    The Opioid Diversion Enterprise was and is a shockingly successful endeavor. The Opioid Diversion Enterprise has been conducting business uninterrupted since its genesis. But, it was not until recently that State and federal regulators finally began to unravel the extent of the enterprise and the toll that it exacted on the American public and the City of Henderson, Nevada and its citizens.

347.    At all relevant times, the Opioid Diversion Enterprise: (a) had an existence separate and distinct from each Racketeering Defendant; (b) was separate and distinct from the pattern of racketeering in which the Racketeering Defendants engaged; (c) was an ongoing and continuing organization consisting of legal entities, including each of the Racketeering Defendants; (d) characterized by interpersonal relationships among the Racketeering Defendants; (e) had sufficient longevity for the enterprise to pursue its purpose; and (f) functioned as a continuing unit. Each member of the Opioid Diversion Enterprise participated in the conduct of the enterprise, including patterns of racketeering activity, and shared in the astounding growth of profits supplied by fraudulently inflating opioid sales generated as a result of the Opioid Diversion Enterprise's disregard for their duty to prevent diversion of their drugs into the illicit market and then requesting the DEA increase production quotas, all so that the Racketeering Defendants would have a larger pool of prescription opioids from which to profit.

348.    The Opioid Diversion Enterprise functioned by selling prescription opioids. While there may be some legitimate uses and/or needs for prescription opioids, the Racketeering

---

[17] Keyes KM, Cerdá M, Brady JE, Havens JR, Galea S. *Understanding the rural-urban differences in nonmedical prescription opioid use and abuse in the United States.* Am J Public Health. 2014;104(2):e52-9.
[18] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy- amid-drug-epidemic.

1    Defendants, through their illegal enterprise, engaged in a pattern of racketeering activity that

2    involves a fraudulent scheme to increase revenue by violating State and Federal laws requiring the

3    maintenance of effective controls against diversion of prescription opioids, and the identification,

4    investigation, and reporting of suspicious orders of prescription opioids destined for the illicit drug

5    market. The goal of Defendants' scheme was to increase profits from opioid sales. But,

6    Defendants' profits were limited by the production quotas set by the DEA, so the Defendants

7    refused to identify, investigate and/or report suspicious orders of their prescription opioids being

8    diverted into the illicit drug market. The end result of this strategy was to increase and maintain

9    artificially high production quotas of opioids so that there was a larger pool of opioids for

10    Defendants to manufacture and distribute for public consumption.

11    349.    Within the Opioid Diversion Enterprise, there were interpersonal relationships and

12    common communication by which the Racketeering Defendants shared information on a regular

13    basis. These interpersonal relationships also formed the organization of the Opioid Diversion

14    Enterprise. The Opioid Diversion Enterprise used their interpersonal relationships and

15    communication network for the purpose of conducting the enterprise through a pattern of

16    racketeering activity.

17    350.    Each of the Racketeering Defendants had a systematic link to each other through

18    joint participation in lobbying groups, trade industry organizations, contractual relationships and

19    continuing coordination of activities. The Racketeering Defendants participated in the operation

20    and management of the Opioid Diversion Enterprise by directing its affairs, as described herein.

21    While the Racketeering Defendants participated in, and are members of, the enterprise, they each

22    have a separate existence from the enterprise, including distinct legal statuses, different offices and

23    roles, bank accounts, officers, directors, employees, individual personhood, reporting

24    requirements, and financial statements.

25    351.    The Racketeering Defendants exerted substantial control over the Opioid

26    Diversion Enterprise by their membership in the Pain Care Forum ("PCF"), the HDA, and

27    through their contractual relationships.

28    352.    PCF has been described as a coalition of drugmakers, trade groups and dozens of

1   non-profit organizations supported by industry funding. The PCF recently became a national news

2   story when it was discovered that lobbyists for members of the PCF quietly shaped federal and

3   state policies regarding the use of prescription opioids for more than a decade.

4        353.    The Center for Public Integrity and The Associated Press obtained "internal

5   documents shed[ding] new light on how drugmakers and their allies shaped the national response

6   to the ongoing wave of prescription opioid abuse."[19] Specifically, PCF members spent over $740

7   million lobbying in the nation's capital and in all 50 statehouses on an array of issues, including

8   opioid-related measures.[20]

9        354.    Not surprisingly, each of the Racketeering Defendants who stood to profit from

10   lobbying in favor of prescription opioid use is a member of and/or participant in the PCF.[21] In

11   2012, membership and participating organizations included the HDA (of which all Racketeering

12   Defendants are members), Purdue, Actavis, and Teva.[22] Each of the Manufacturer Defendants

13   worked together through the PCF to advance the interests of the enterprise. But, the Manufacturer

14   Defendants were not alone. The Distributor Defendants actively participated, and continue to

15   participate in the PCF, at a minimum, through their trade organization, the HDA.[23] Plaintiff is

16   informed and believes that the Distributor Defendants participated directly in the PCF as well.

17        355.    The 2012 Meeting Schedule for the Pain Care Forum is particularly revealing on

18   the subject of the Defendants' interpersonal relationships. The meeting schedule indicates that

19   meetings were held in the D.C. office of Powers Pyles Sutter & Verville on a monthly basis, unless

20   otherwise noted. Local members were "encouraged to attend in person" at the monthly meetings.

21   And, the meeting schedule indicates that the quarterly and year-end meetings included a "Guest

22   Speaker."

23        356.    The 2012 Pain Care Forum Meeting Schedule demonstrates that each of the

24   Defendants participated in meetings on a monthly basis, either directly or through their trade

25

26   [19] Matthew Perrone, *Pro-Painkiller echo chamber shaped policy amid drug epidemic*, The Center for Public Integrity (September 19, 2017, 12:01 a.m.), https://www.publicintegrity.org/2016/09/19/20201/pro-painkiller-echo-chamber-shaped-policy- amid-drug-epidemic (emphasis added).

27   [20] *Id.*

28   [21] PAIN CARE FORUM 2012 Meetings Schedule, (last updated December 2011), https://assets.documentcloud.org/documents/3108982/PAIN-CARE-FORUM-Meetings- Schedule-amp.pdf.
[22] *Id.* Plaintiff is informed and believes that Mallinckrodt became an active member of the PCF sometime after 2012.
[23] *Id.*

1  organization, in a coalition of drugmakers and their allies whose sole purpose was to shape the
2  national response to the ongoing prescription opioid epidemic, including the concerted lobbying
3  efforts that the PCF undertook on behalf of its members.

4      357.   Second, the HDA – or Healthcare Distribution Alliance – led to the formation of
5  interpersonal relationships and an organization between the Racketeering Defendants. Although
6  the entire HDA membership directory is private, the HDA website confirms that each of the
7  Distributor Defendants and the Manufacturer Defendants named in the Complaint, including
8  Actavis, Purdue, and Mallinckrodt, were members of the HDA.[24] The HDA and each of the
9  Distributor Defendants eagerly sought the active membership and participation of the
10 Manufacturer Defendants by advocating that one of the benefits of membership included the ability
11 to develop direct relationships between Manufacturers and Distributors at high executive levels.

12     358.   In fact, the HDA touted the benefits of membership to the Manufacturer
13 Defendants, advocating that membership included the ability to, among other things, "network one
14 on one with manufacturer executives at HDA's members-only Business and Leadership
15 Conference," "networking with HDA wholesale distributor members," "opportunities to host and
16 sponsor HDA Board of Directors events," "participate on HDA committees, task forces and
17 working groups with peers and trading partners," and "make connections."[25] Clearly, the HDA
18 and the Distributor Defendants believed that membership in the HDA was an opportunity to create
19 interpersonal and ongoing organizational relationships between the Manufacturers and
20 Distributors.

21     359.   The application for manufacturer membership in the HDA further indicates the
22 level of connection that existed between the Racketeering Defendants.[26] The manufacturer
23 membership application must be signed by a "senior company executive," and it requests that
24 the manufacturer applicant identify a key contact and any additional contacts from within its
25 company. The HDA application also requests that the manufacturer identify its current

26

27 [24] Manufacturer Membership, Healthcare Distribution Alliance, (accessed on September 14, 2017),
https://www.healthcaredistribution.org/about/membership/manufacturer.
28 [25] Manufacturer Membership Benefits, Healthcare Distribution Alliance, (accessed on September 14, 2017),
https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership- benefits.ashx?la=en.
[26] Manufacturer Membership Application, Healthcare Distribution Alliance, (accessed on September 14, 2017),
https://www.healthcaredistribution.org/~/media/pdfs/membership/manufacturer-membership- application.ashx?la=en.

1  distribution information and its most recent year end net sales through any HDA distributors,

2  including but not limited to, Defendants AmerisourceBergen, Cardinal Health, and McKesson.[27]

3      360.    After becoming members, the Distributors and Manufacturers were eligible to

4  participate on councils, committees, task forces and working groups, including:

    a.  Industry Relations Council: "This council, composed of distributor and manufacturer members, provides leadership on pharmaceutical distribution and supply chain issues."[28]

    b.  Business Technology Committee: "This committee provides guidance to HDA and its members through the development of collaborative e-commerce business solutions. The committee's major areas of focus within pharmaceutical distribution include information systems, operational integration and the impact of e- commerce." Participation in this committee includes distributors and manufacturer members.[29]

    c.  Health, Beauty and Wellness Committee: "This committee conducts research, as well as creates and exchanges industry knowledge to help shape the future of the distribution for health, beauty and wellness/consumer products in the healthcare supply chain." Participation in this committee includes distributors and manufacturer members.[30]

    d.  Logistics Operation Committee: "This committee initiates projects designed to help members enhance the productivity, efficiency and customer satisfaction within the healthcare supply chain. Its major areas of focus include process automation, information systems, operational integration, resource management and quality improvement." Participation in this committee includes distributors and manufacturer members.[31]

    e.  Manufacturer Government Affairs Advisory Committee: "This committee provides a forum for briefing HDA's manufacturer members on federal and state legislative and regulatory activity affecting the pharmaceutical distribution channel. Topics discussed include such issues as prescription drug traceability, distributor licensing, FDA and DEA regulation of distribution, importation and Medicaid/Medicare reimbursement." Participation in this committee includes manufacturer members.[32]

    f.  Bar Code Task Force: Participation includes Distributor, Manufacturer and

---

[27] *Id.*
[28] Councils and Committees, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/councils-and-committees.
[29] *Id.*
[30] *Id.*
[31] *Id.*
[32] *Id.*

73

Service Provider Members.[33]

g. eCommerce Task Force: Participation includes Distributor, Manufacturer and Service Provider Members.[34]

h. ASN Working Group: Participation includes Distributor, Manufacturer and Service Provider Members.[35]

i. Contracts and Chargebacks Working Group: "This working group explores how the contract administration process can be streamlined through process improvements or technical efficiencies. It also creates and exchanges industry knowledge of interest to contract and chargeback professionals." Participation includes Distributor and Manufacturer Members.[36]

361.    The councils, committees, task forces and working groups provided the Manufacturer and Distributor Defendants with the opportunity to work closely together in shaping their common goals and forming the enterprise's organization.

362.    The HDA also offers a multitude of conferences, including annual business and leadership conferences. The HDA and the Distributor Defendants advertise these conferences to the Manufacturer Defendants as an opportunity to "bring together high-level executives, thought leaders and influential managers . . . to hold strategic business discussions on the most pressing industry issues."[37] The conferences also gave the Manufacturer and Distributor Defendants "unmatched opportunities to network with [their] peers and trading partners at all levels of the healthcare distribution industry."[38] The HDA and its conferences were significant opportunities for the Manufacturer and Distributor Defendants to interact at a high-level of leadership. And, it is clear that the Manufacturer Defendants embraced this opportunity by attending and sponsoring these events.[39]

363.    Third, the Racketeering Defendants maintained their interpersonal relationships

---

[33] *Id.*
[34] *Id.*
[35] *Id.*
[36] *Id.*
[37] Business and Leadership Conference – Information for Manufacturers, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015-business-and-leadership-conference/bld-for- manufacturers.
[38] *Id.*
[39] 2015 Distribution Management Conference and Expo, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/events/2015- distribution-management-conference.

74

1  by working together and exchanging information and driving the unlawful sales of their opioids
2  through their contractual relationships, including chargebacks and vault security programs.

3      364.    The Manufacturer Defendants engaged in an industry-wide practice of paying
4  rebates and/or chargebacks to the Distributor Defendants for sales of prescription opioids.[40] As
5  reported in the Washington Post, identified by Senator McCaskill, and acknowledged by the HDA,
6  there is an industry-wide practice whereby the Manufacturers paid the Distributors rebates and/or
7  chargebacks on their prescription opioid sales.[41] On information and belief, these contracts were
8  negotiated at the highest levels, demonstrating ongoing relationships between the Manufacturer
9  and Distributor Defendants. In return for the rebates and chargebacks, the Distributor Defendants
10 provided the Manufacturer Defendants with detailed information regarding their prescription
11 opioid sales, including purchase orders, acknowledgements, ship notices, and invoices.[42] The
12 Manufacturer Defendants used this information to gather high-level data regarding overall
13 distribution and direct the Distributor Defendants on how to most effectively sell the prescription
14 opioids.

15     365.    The contractual relationships among the Racketeering Defendants also include
16 vault security programs. The Racketeering Defendants are required to maintain certain security
17 protocols and storage facilities for the manufacture and distribution of their opiates. Plaintiff is
18 informed and believes that manufacturers negotiated agreements whereby the Manufacturers
19 installed security vaults for Distributors in exchange for agreements to maintain minimum sales
20 performance thresholds. Plaintiff is informed and believes that these agreements were used by
21 the Racketeering Defendants as a tool to violate their reporting and diversion duties under
22 Nevada law,[43] in order to reach the required sales requirements.

23

24  [40] Lenny Bernstein & Scott Higham, *The government's struggle to hold opioid manufacturers accountable*, The Washington Post, (April 2, 2017), https://www.washingtonpost.com/graphics/investigations/dea-mallinckrodt/?utm_term=.b24cc81cc356; *see also*, Letter from Sen. Claire McCaskill, (July 27, 2017),
25  https://www.mccaskill.senate.gov/imo/media/image/july-opioid-investigation-letter-manufacturers.png; Letter from Sen. Claire McCaskill, (July 27, 2017), https://www.mccaskill.senate.gov/imo/media/image/july-opioid-
26  investigation-letter-manufacturers.png; Letters From Sen. Claire McCaskill, (March 28, 2017), https://www.mccaskill.senate.gov/opioid-investigation; Purdue Managed Markets, Purdue Pharma, (accessed on
27  September 14, 2017), http://www.purduepharma.com/payers/managed-markets/.
    [41] *Id.*
28  [42] Webinars, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/resources/webinar-leveraging-edi.
    [43] *See, e.g.*, NRS § 453.231(a).

1     366. Taken together, the interaction and length of the relationships between and among
2 the Manufacturer and Distributor Defendants reflects a deep level of interaction and cooperation
3 between two groups in a tightly knit industry. The Manufacturer and Distributor Defendants were
4 not two separate groups operating in isolation or two groups forced to work together in a closed
5 system. The Racketeering Defendants operated together as a united entity, working together on
6 multiple fronts, to engage in the unlawful sale of prescription opioids. The HDA and the Pain Care
7 Forum are but two examples of the overlapping relationships and concerted joint efforts to
8 accomplish common goals and demonstrate that the leaders of each of the Racketeering
9 Defendants were in communication and cooperation.

10     367. According to articles published by the Center for Public Integrity and The
11 Associated Press, the Pain Care Forum – whose members include the Manufacturers and the
12 Distributors' trade association – has been lobbying on behalf of the Manufacturers and Distributors
13 for "more than a decade."[44] From 2006 to 2016 the Distributors and Manufacturers worked
14 together through the Pain Care Forum to spend over $740 million lobbying in the nation's capital
15 and in all 50 statehouses on issues including opioid-related measures.[45] Similarly, the HDA has
16 continued its work on behalf of Distributors and Manufacturers, without interruption, since at least
17 2000, if not longer.[46]

18     368. Defendants, individually and collectively through trade groups in the industry,
19 pressured the U.S. Department of Justice to "halt" prosecutions and lobbied Congress to strip the
20 DEA of its ability to immediately suspend distributor registrations. The result was a "sharp drop
21 in enforcement actions" and the passage of the "Ensuring Patient Access and Effective Drug
22 Enforcement Act" which, ironically, raised the burden for the DEA to revoke a distributor's license
23 from "imminent harm" to "immediate harm" and provided the industry the right to "cure" any

[44] Matthew Perrone & Ben Wieder, *Pro-Painkiller Echo Chamber Shaped Policy Amid Drug Epidemic*, The Ctr. for Pub. Integrity, https://www.publicintegrity.org/2016/09/19/20201/pro ainkiller-echo-chamber-shaped-policy-amid-drug-epidemic (last updated Dec. 15, 2016, 9:09 AM).
[45] *Id.*
[46] HDA History, Healthcare Distribution Alliance, (accessed on September 14, 2017), https://www.healthcaredistribution.org/about/hda-history.

76

1  violations of law before a suspension order can be issued.[47]

2      369. As described above, the Racketeering Defendants began working together as early

3  as 2006 through the Pain Care Forum and/or the HDA to further the common purpose of their

4  enterprise. Plaintiff is informed and believes that the Racketeering Defendants worked together

5  as an ongoing and continuous organization throughout the existence of their enterprise.

6  ## CONDUCT OF THE OPIOID DIVERSION ENTERPRISE

7      370. The Racketeering Defendants conducted the Opioids Diversion Enterprise, and

8  participated in the enterprise, by engaging in a pattern of racketeering activity, as prohibited by

9  NRS § 207.400.

10      371. During the time period alleged in this Complaint, the Racketeering Defendants

11  exerted control over, conducted and/or participated in the Opioid Diversion Enterprise by

12  fraudulently failing to comply with their obligations under Nevada law (and federal law, as

13  incorporated into Nevada law) to identify, investigate and report suspicious orders of opioids in

14  order to prevent diversion of those highly addictive substances into the illicit market, to halt such

15  unlawful sales as set forth below. In doing so, the Racketeering Defendants increased production

16  quotas and generated unlawful profits.

17  372. The Racketeering Defendants disseminated statements that were false and misleading – either

18  affirmatively or through half-truths and omissions – to the general public, the City of Henderson,

19  Henderson consumers, and the Nevada Board of Pharmacy, claiming that they were complying

20  with their obligations to maintain effective controls against diversion of their prescription

21  opioids.

22      373. The Racketeering Defendants disseminated statements that were false and

23  misleading – either affirmatively or through half-truths and omissions – to the general public, the

24  City of Henderson, Henderson consumers, and the Nevada Board of Pharmacy, claiming that

25  they were complying with their obligations to design and operate a system to disclose to the

26  registrant suspicious orders of their prescription opioids.

27

28  ---
[47] *See* Bernstein & Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control, supra*; Bernstein & Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis, supra*; Eyre, *supra*.

374.   The Racketeering Defendants disseminated statements that were false and misleading – either affirmatively or through half-truths and omissions – to the general public, the City of Henderson, Henderson consumers, and the Nevada Board of Pharmacy claiming that they were complying with their obligation to notify the DEA of any suspicious orders or diversion of their prescription opioids.

375.   The Opioid Diversion Enterprise worked to scale back regulatory oversight by the DEA that could interfere with the Racketeering Defendants' ability to distribute their opioid drugs in the City of Henderson, Nevada. To distribute controlled substances in Nevada, the Racketeering Defendants had to be able to demonstrate possession of a current Nevada registration. *See* NRS § 453.226. Even if they held a current registration, the Racketeering Defendants' ability to obtain a Nevada registration could be jeopardized by past suspension or revocation of their DEA registration. NRS § 453.231(1)(g).

376.   The Racketeering Defendants paid nearly $800 million dollars to influence local, state and federal governments throughout the United States and in Nevada, through joint lobbying efforts as part of the Pain Care Forum. The Racketeering Defendants were all members of the Pain Care Forum either directly or indirectly through the HDA. The lobbying efforts of the Pain Care Forum and its members included efforts to pass legislation making it more difficult for the DEA to suspend and/or revoke the Manufacturers' and Distributors' registrations for failure to report suspicious orders of opioids—protecting the Racketeering Defendants' ability to distribute prescription opioids in Nevada.

377.   The Racketeering Defendants exercised control and influence over the distribution industry by participating and maintaining membership in the HDA.

378.   The Racketeering Defendants applied political and other pressure on the DOJ and DEA to halt prosecutions for failure to report suspicious orders of prescription opioids and lobbied Congress to strip the DEA of its ability to immediately suspend registrations pending investigation by passing the "Ensuring Patient Access and Effective Drug Enforcement Act."[48]

---

[48] *See* HDMA is now the Healthcare Distribution Alliance, Pharmaceutical Commerce, (June 13, 2016, updated July 6, 2016), http://pharmaceuticalcommerce.com/business-and- finance/hdma-now-healthcare-distribution-alliance/; Bernstein & Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control,*

379. The Racketeering Defendants engaged in an industry-wide practice of paying rebates and chargebacks to incentivize unlawful opioid prescription sales. Plaintiff is informed and believes that the Manufacturer Defendants used the chargeback program to acquire detailed high-level data regarding sales of the opioids they manufactured. And, Plaintiff is informed and believes that the Manufacturer Defendants used this high-level information to direct the Distributor Defendants' sales efforts to regions where prescription opioids were selling in larger volumes.

380. The Manufacturer Defendants lobbied the DEA to increase Aggregate Production Quotas, year after year by submitting net disposal information that the Manufacturer Defendants knew included sales that were suspicious and involved the diversion of opioids that had not been properly investigated or reported by the Racketeering Defendants.

381. The Distributor Defendants developed "know your customer" questionnaires and files. This information, compiled pursuant to comments from the DEA in 2006 and 2007, was intended to help the Racketeering Defendants identify suspicious orders or customers who were likely to divert prescription opioids.[49] On information and belief, the "know your customer" questionnaires informed the Racketeering Defendants of the number of pills that the pharmacies sold, how many non-controlled substances are sold compared to controlled substances, whether the pharmacy buys from other distributors, the types of medical providers in the area, including pain clinics, general practitioners, hospice facilities, cancer treatment facilities, among others, and these questionnaires put the recipients on notice of suspicious orders.

382. The Racketeering Defendants refused to identify, investigate and report suspicious orders to the DEA, the Nevada Board of Pharmacy, and the FDA when they became aware of the same despite their actual knowledge of drug diversion rings. The Racketeering Defendants refused to identify suspicious orders and diverted drugs despite the DEA issuing final

---

*supra*; Bernstein & Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid Opioid Crisis, supra*; Eyre, *supra*.

[49] Suggested Questions a Distributor should ask prior to shipping controlled substances, Drug Enforcement Administration (available at https://www.deadiversion.usdoj.gov/mtgs/pharm_industry/14th_pharm/ levinl_ques.pdf); Richard Widup, Jr., Kathleen H. Dooley, Esq. Pharmaceutical Production Diversion: Beyond the PDMA, Purdue Pharma and McQuite Woods LLC, (available at https://www.mcguirewoods.com/news-resources/publications/lifesciences/product_diversion_beyond_pdma.pdf).

79

decisions against the Distributor Defendants in 178 registrant actions between 2008 and 2012[50] and 117 recommended decisions in registrant actions from The Office of Administrative Law Judges. These numbers include 76 actions involving orders to show cause and 41 actions involving immediate suspension orders – all for failure to report suspicious orders.[51]

383. Defendants' scheme had decision-making structure that was driven by the Manufacturer Defendants and corroborated by the Distributor Defendants. The Manufacturer Defendants worked together to control the State and Federal Government's response to the manufacture and distribution of prescription opioids by increasing production quotas through a systematic refusal to maintain effective controls against diversion and to identify suspicious orders and report them to the DEA and State governments, including within the City of Henderson.

384. The Racketeering Defendants also worked together to ensure that the Aggregate Production Quotas, Individual Quotas and Procurement Quotas allowed by the DEA stayed high and to ensure that suspicious orders were not reported to the DEA. By not reporting suspicious orders or diversion of prescription opioids, the Racketeering Defendants ensured that the DEA had no basis for refusing to increase, or to decrease, the production quotas for prescription opioids due to diversion of suspicious orders. The Racketeering Defendants influenced the DEA production quotas in the following ways:

a. The Distributor Defendants assisted the enterprise and the Manufacturer Defendants in their lobbying efforts through the Pain Care Forum;

b. The Distributor Defendants invited the participation, oversight and control of the Manufacturer Defendants by including them in the HDA, including on the councils, committees, task forces, and working groups;

c. The Distributor Defendants provided sales information to the Manufacturer Defendants regarding their prescription opioids, including reports of all opioid prescriptions filled by the Distributor Defendants;

d. The Manufacturer Defendants used a chargeback program to ensure delivery of the Distributor Defendants' sales information;

[50] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.
[51] *Id.*

80

e. The Manufacturer Defendants obtained sales information from QuintilesIMS (formerly IMS Health) that gave them a "stream of data showing how individual doctors across the nation were prescribing opioids."[52]

f. The Distributor Defendants accepted rebates and chargebacks for orders of prescription opioids;

g. The Manufacturer Defendants used the Distributor Defendants' sales information and the data from QuintilesIMS to instruct the Distributor Defendants to focus their distribution efforts to specific areas where the purchase of prescription opioids was most frequent;

h. The Racketeering Defendants identified suspicious orders of prescription opioids and then continued filling those unlawful orders, without reporting them, knowing that they were suspicious and/or being diverted into the illicit drug market;

i. The Racketeering Defendants refused to report suspicious orders of prescription opioids despite repeated investigation and punishment of the Distributor Defendants by the DEA for failure to report suspicious orders; and

j. The Racketeering Defendants withheld information regarding suspicious orders and illicit diversion from the DEA because it would have revealed that the "medical need" for and the net disposal of their drugs did not justify the production quotas set by the DEA.

385. The scheme devised and implemented by the Racketeering Defendants amounted to a common course of conduct characterized by a refusal to maintain effective controls against diversion, in intentional violation of Nevada law, and all designed and operated to ensure the continued unlawful sale of controlled substances.

## PATTERN OF RACKETEERING ACTIVITY

386. The Racketeering Defendants conducted and participated in the conduct of the Opioid Diversion Enterprise through a pattern of racketeering activity as defined in NRS § 207.390, by at least two crimes related to racketeering (NRS § 207.360), trafficking in controlled substances (NRS §§ 207.360(22); 453.3395), multiple transactions involving deceit in the course of an enterprise (NRS §§ 207.360(35); 205.377) and distribution of controlled substances or

---

[52] Harriet Ryan, et al., *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.

1    controlled substance analogues (NRS § 453.331), and punishable by imprisonment of at least one
2    year, with the intent of accomplishing activities prohibited by § 207.400 of the Racketeering Act.

3        387.    The Racketeering Defendants committed, conspired to commit, and/or aided and
4    abetted in the commission of at least two predicate acts of racketeering activity (i.e. violations of
5    NRS §§ 207.360), within a five-year period. The multiple acts of racketeering activity that the
6    Racketeering Defendants committed, or aided and abetted in the commission of, were related to
7    each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern
8    of racketeering activity." The racketeering activity was made possible by the Racketeering
9    Defendants' regular use of the facilities, services, distribution channels, and employees of the
10   Opioid Diversion Enterprise.

11       388.    The Racketeering Defendants committed these predicate acts, which number in
12   the thousands, intentionally and knowingly with the specific intent to advance the Opioids
13   Diversion Enterprise by conducting activities prohibited by NRS §§ 207.360, 207.390, 207.400.

14       389.    The predicate acts all had the purpose of generating significant revenue and profits
15   for the Racketeering Defendants while City of Henderson was left with substantial injury to its
16   business through the damage that the prescription opioid epidemic caused. The predicate acts
17   were committed or caused to be committed by the Racketeering Defendants through their
18   participation in the Opioid Diversion Enterprise and in furtherance of its fraudulent scheme. The
19   predicate acts were related and not isolated events.

20       390.    The pattern of racketeering activity alleged herein and the Opioid Diversion
21   Enterprise are separate and distinct from each other. Likewise, the Racketeering Defendants are
22   distinct from the enterprise.

23       391.    The pattern of racketeering activity alleged herein is continuing as of the date of
24   this Complaint and, upon information and belief, will continue into the future unless enjoined by
25   this Court.

26       392.    Many of the precise dates of the Racketeering Defendants' criminal actions at issue
27   here have been hidden and cannot be alleged without access to Defendants' books and records.
28   Indeed, an essential part of the successful operation of the Opioid Diversion Enterprise alleged

82

1  herein depended upon secrecy.

2       393.   Each instance of racketeering activity alleged herein was related, had similar
3  purposes, involved the same or similar participants and methods of commission, and had similar
4  results affecting similar victims, including consumers in the City of Henderson, Nevada.
5  Defendants calculated and intentionally crafted the Opioid Diversion Enterprise and their scheme
6  to increase and maintain their increased profits, without regard to the effect such behavior would
7  have on the City of Henderson, Nevada, Henderson consumers, or other Henderson citizens. In
8  designing and implementing the scheme, at all times Defendants were cognizant of the fact that
9  those in the manufacturing and distribution chain rely on the integrity of the pharmaceutical
10 companies and ostensibly neutral third parties to provide objective and reliable information
11 regarding Defendants' products and their manufacture and distribution of those products. The
12 Racketeering Defendants were also aware that the City of Henderson and the citizens of this
13 jurisdiction rely on the Racketeering Defendants to maintain a closed system and to protect
14 against the non-medical diversion and use of their dangerously addictive opioid drugs.

15      394.   By intentionally refusing to report and halt suspicious orders of their prescription
16 opioids, the Racketeering Defendants engaged in a fraudulent scheme and unlawful course of
17 conduct constituting a pattern of racketeering activity.

18      395.   It was foreseeable to Defendants that refusing to report and halt suspicious orders
19 would harm City of Henderson by allowing the flow of prescription opioids from appropriate
20 medical channels into the illicit drug market.

21      396.   The Racketeering Defendants did not undertake the predicate acts described
22 herein in isolation, but as part of a common scheme. Various other persons, firms, and
23 corporations, including third-party entities and individuals not named as defendants in this
24 Complaint, may have contributed to and/or participated in the scheme with the Racketeering
25 Defendants in these offenses and have performed acts in furtherance of the scheme to increase
26 revenues, increase market share, and /or minimize the losses for the Racketeering Defendants.

27      397.   The Racketeering Defendants aided and abetted others in the violations of NRS
28 §§ 207.360, 207.390, and 207.400, while sharing the same criminal intent as the principals who

83

committed those violations, thereby rendering them indictable as principals in the offenses.

398.    The last racketeering incident occurred within five years of the commission of a prior incident of racketeering.

**The Racketeering Defendants Conducted the Opioid Diversion Enterprise through Acts of Fraud.**

399.    Fraud consists of the intentional misappropriation or taking of anything of value that belongs to another by means of fraudulent conduct, practices or representations.

400.    The Racketeering Defendants' fraudulent conduct, practices, and representations include, but are not limited to:

    a.  Misrepresentations to facilitate Defendants' DEA registrations, which could be a bar to their registrations with the Nevada Board of Pharmacy;

    b.  Requests for higher aggregate production quotas, individual production quotas, and procurement quotas to support Defendants' manufacture and distribution of controlled substances they knew were being or would be unlawfully diverted;

    c.  Misrepresentations and misleading omissions in Defendants' records and reports that were required to be submitted to the DEA and the Nevada Board of Pharmacy pursuant to Nevada Administrative Code provisions;

    d.  Misrepresentations and misleading omissions in documents and communications related to the Defendants' mandatory DEA reports that would affect Nevada registrant status; and

    e.  Rebate and chargeback arrangements between the Manufacturers and the Distributors that Defendants used to facilitate the manufacture and sale of controlled substances they knew were being or would be unlawfully diverted into and from Nevada.

401.    Specifically, the Racketeering Defendants made misrepresentations about their compliance with Federal and State laws requiring them to identify, investigate and report suspicious orders of prescription opioids and/or diversion of the same into the illicit market, all while Defendants were knowingly allowing millions of doses of prescription opioids to divert into the illicit drug market. The Racketeering Defendants' scheme and common course of conduct was intended to increase or maintain high production quotas for their prescription opioids from which they could profit.

402.    At the same time, the Racketeering Defendants misrepresented the superior safety

84

1 features of their order monitoring programs, their ability to detect suspicious orders, their
2 commitment to preventing diversion of prescription opioids, and that they complied with all state
3 and federal regulations regarding the identification and reporting of suspicious orders of
4 prescription opioids.

5      403.   The Racketeering Defendants intended to and did, through the above-described
6 fraudulent conduct, practices, and representations, intentionally misappropriate funds from the
7 City of Henderson and from private insurers, in excess of $500, including, for example:

8         a.   Costs incurred by and resources diverted from the City of Henderson infrastructure and
9             health care providers;

10         b.   Any and all cost or payments related to benefits of the City of Henderson employees;

11      404.   Many of the precise dates of the fraudulent acts and practices have been deliberately
12 hidden and cannot be alleged without access to Defendants' books and records. But, Plaintiff has
13 described the types of, and in some instances, occasions on which the predicate acts of fraud
14 occurred.

15 **The Racketeering Defendants Unlawfully Trafficked in and Distributed Controlled Substances.**

16      405.   Defendants' racketeering activities also included violations of the Nevada
17 Controlled Substances Act, § 453.3395, and each act is chargeable or indictable under the laws of
18 Nevada and punishable by imprisonment for more than one year. *See* NRS § 207.360(22).

19      406.   Under Nevada law (NRS § 453.3395), it is unlawful to "knowingly or
20 intentionally sell[], manufacture[], deliver[] or bring[] into this state"— prescription opioids,
21 which are Schedule II controlled substances that are narcotic drugs, except as authorized by the
22 Nevada Controlled Substances Act.

23      407.   The Racketeering Defendants intentionally trafficked in prescription opioid drugs,
24 in violation of Nevada law, by manufacturing, selling, and/or distributing those drugs in the City
25 of Henderson in a manner not authorized by the Nevada Controlled Substances Act. The
26 Racketeering Defendants failed to act in accordance with the Nevada Controlled Substances Act
27 because they did not act in accordance with registration requirements as provided in that Act.
28

     408.   Among other infractions, the Racketeering Defendants did not comply with 21

1   USC § 823 and its attendant regulations (*e.g.*, 21 CFR § 1301.74)[53] which are incorporated into
2   Nevada state law, or the Nevada Pharmacy Board regulations. The Racketeering Defendants failed
3   to furnish notifications and omitted required reports to the Nevada Board.

4   409.   Plaintiff is informed and believes that the Racketeering Defendants failed to
5   furnish required notifications and make reports as part of a pattern and practice of willfully and
6   intentionally omitting information from their mandatory reports to the DEA, as required by 21
7   CFR § 1301.74, throughout the United States.

8   410.   For example, the DEA and DOJ began investigating McKesson in 2013 regarding
9   its monitoring and reporting of suspicious controlled substances orders. On April 23, 2015,
10  McKesson filed a Form-8-K announcing a settlement with the DEA and DOJ wherein it admitted
11  to violating the CSA and agreed to pay $150 million and have some of its DEA registrations
12  suspended on a staggered basis. The settlement was finalized on January 17, 2017.[54]

13  411.   Purdue's experience in Los Angeles is another striking example of Defendants'
14  willful violation of their duty to report suspicious orders of prescription opioids. In 2016, the Los
15  Angeles Times reported that Purdue was aware of a pill mill operating out of Los Angeles
16  yet failed to alert the DEA.[55] The LA Times uncovered that Purdue began tracking a surge in
17  prescriptions in Los Angeles, including one prescriber in particular. A Purdue sales manager spoke
18  with company officials in 2009 about the prescriber, asking "Shouldn't the DEA be contacted
19  about this?" and adding that she felt "very certain this is an organized drug ring."[56] Despite
20  knowledge of the staggering amount of pills being issued in Los Angeles, and internal discussion
21  of the problem, "Purdue did not shut off the supply of highly addictive OxyContin and did not
22  tell authorities what it knew about Lake Medical until several years later when the clinic was out
23  of business and its leaders indicted. By that time, 1.1 million pills had spilled into the hands of

24

25  [53] Once again, throughout this Count and in this Complaint Plaintiff cites federal statutes and federal regulations to state the duty owed under Nevada tort law, *not* to allege an independent federal cause of action or substantial federal question. *See, e.g., Herrera*, 2003-NMSC-018, ¶7.
26  [54] McKesson, McKesson Finalizes Settlement with U.S. Department of Justice and U.S. Drug Enforcement Administration to Resolve Past Claims, About McKesson / Newsroom / Press Releases, (January 17, 2017),
27  http://www.mckesson.com/about-mckesson/newsroom/press- releases/2017/mckesson-finalizes-settlement-with-doj-and-dea-to-resolve-past-claims/.
28  [55] Harriet Ryan, et al., *More than 1 million OxyContin pills ended up in the hands of criminals and addicts. What the drugmaker knew*, Los Angeles Times, (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/.
[56] *Id.*

86

1  Armenian mobsters, the Crips gang and other criminals."[57]

2  412.  Finally, Mallinckrodt was recently the subject of a DEA and Senate investigation

3  for its opioid practices. Specifically, in 2011, the DEA targeted Mallinckrodt, arguing that it

4  ignored its responsibility to report suspicious orders as 500 million of its pills ended up in Florida

5  between 2008 and 2012.[58] After six years of DEA investigation, Mallinckrodt agreed to a

6  settlement involving a $35 million fine. Federal prosecutors summarized the case by saying that

7  Mallinckrodt's response was that everyone knew what was going on in Florida, but they had no

8  duty to report it.[59]

9  413.  The Racketeering Defendants' pattern and practice of willfully and intentionally

10  omitting information from their mandatory reports is evident in the sheer volume of enforcement

11  actions available in the public record against the Distributor Defendants.[60] For example:

12

13  a.  On April 24, 2007, the DEA issued an *Order to Show Cause and Immediate*
14  *Suspension Order* against the AmerisourceBergen Orlando, Florida distribution
   center ("Orlando Facility") alleging failure to maintain effective controls against
15  diversion of controlled substances. On June 22, 2007, AmerisourceBergen
   entered into a settlement that resulted in the suspension of its DEA registration;
16

17  b.  On November 28, 2007, the DEA issued an *Order to Show Cause and Immediate*
   *Suspension Order* against the Cardinal Health Auburn, Washington Distribution
18  Center ("Auburn Facility") for failure to maintain effective controls against
19  diversion of hydrocodone;

20  c.  On December 5, 2007, the DEA issued an *Order to Show Cause and Immediate*
21  *Suspension Order* against the Cardinal Health Lakeland, Florida Distribution
   Center ("Lakeland Facility") for failure to maintain effective controls against
22  diversion of hydrocodone;

23  d.  On December 7, 2007, the DEA issued an *Order to Show Cause and Immediate*
24  *Suspension Order* against the Cardinal Health Swedesboro, New Jersey
   Distribution Center ("Swedesboro Facility") for failure to maintain effective
25  controls against diversion of hydrocodone;

26
[57] *Id.*
27  [58] Bernstein & Higham, *The government's struggle to hold opioid manufacturers accountable, supra.* This number
   accounted for 66% of all oxycodone sold in the state of Florida during that time.
28  [59] *Id.*
   [60] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement*
   *Administration's Adjudication of Registrant Actions* 6 (2014), https://oig.justice.gov/reports/2014/e1403.pdf.

e. On January 30, 2008, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Stafford, Texas Distribution Center ("Stafford Facility") for failure to maintain effective controls against diversion of hydrocodone;

f. On May 2, 2008, McKesson Corporation entered into an *Administrative Memorandum of Agreement* ("2008 MOA") with the DEA which provided that McKesson would "maintain a compliance program designed to detect and prevent the diversion of controlled substances, inform DEA of suspicious orders required by 21 CFR § 1301.74(b), and follow the procedures established by its Controlled Substance Monitoring Program";

g. On September 30, 2008, Cardinal Health entered into a *Settlement and Release Agreement and Administrative Memorandum of Agreement* with the DEA related to its Auburn Facility, Lakeland Facility, Swedesboro Facility and Stafford Facility. The document also referenced allegations by the DEA that Cardinal failed to maintain effective controls against the diversion of controlled substances at its distribution facilities located in McDonough, Georgia ("McDonough Facility"), Valencia, California ("Valencia Facility") and Denver, Colorado ("Denver Facility");

h. On February 2, 2012, the DEA issued an *Order to Show Cause and Immediate Suspension Order* against the Cardinal Health Lakeland, Florida Distribution Center ("Lakeland Facility") for failure to maintain effective controls against diversion of oxycodone;

i. On December 23, 2016, Cardinal Health agreed to pay a $44 million fine to the DEA to resolve the civil penalty portion of the administrative action taken against its Lakeland, Florida Distribution Center; and

j. On January 5, 2017, McKesson Corporation entered into an *Administrative Memorandum Agreement* with the DEA wherein it agreed to pay a $150,000,000 civil penalty for violation of the 2008 MOA as well as failure to identify and report suspicious orders at its facilities in Aurora CO, Aurora IL, Delran NJ, LaCrosse WI, Lakeland FL, Landover MD, La Vista NE, Livonia MI, Methuen MA, Santa Fe Springs CA, Washington Courthouse OH and West Sacramento CA.

414. These actions against the Distributor Defendants confirm that the Distributors knew they had a duty to maintain effective controls against diversion, design and operate a system to disclose suspicious orders, and to report suspicious orders to the DEA. These actions also

1   demonstrate, on information and belief, that the Manufacturer Defendants were aware of the

2   enforcement against their Distributors and the diversion of the prescription opioids and a

3   corresponding duty to report suspicious orders.

4        415.  Many of the precise dates of Defendants' criminal actions at issue herein were

5   hidden and cannot be alleged without access to Defendants' books and records. Indeed, an

6   essential part of the successful operation of the Opioid Diversion Enterprise depended upon the

7   secrecy of the participants in that enterprise.

8                                  **PRAYER FOR RELIEF**

9   WHEREFORE, the Plaintiff prays for judgment against the Defendants as follows:

10      1.      General damages in an amount in excess of $15,000.00;

11      2.      Special damages in an amount in excess of $15,000.00;

12      3.      For punitive damages in such amount as will sufficiently punish Defendants for

13               their wrongful conduct in the City of Henderson as well as serve as an example to

14               prevent a repetition of such conduct in the City of Henderson in the future;

15      4.      For a fund establishing a medical monitoring program due to the increased

16               susceptibility to injuries and irreparable threat to the health of opioid users

17               resulting from their exposure to opioids, which can only be mitigated or addressed

18               by the creation of a Court-supervised fund, financed by Defendants, and which

19               will:

20               a.      Notify individuals who use or used opioids of the potential harm from

21                        opioids;

22               b.      Aid in the early diagnosis and treatment of resulting injuries through

23                        ongoing testing and monitoring of opioid use;

24               c.      Fund studies and research of the short and long term effects of opioids and

25                        the possible cures and treatments for the detrimental effects of using

26                        opioids:

27               d.      Accumulate and analyze relevant medical and demographic information

28                        from opioid users, including but not limited to the results of testing

                        performed on them;

|   |   |   |   |
|---|---|---|---|
| 1 |   | e. | Gather and forward to treating physicians information related to the |
| 2 |   |   | diagnosis and treatment of injuries which may result from using opioids. |
| 3 |   | 5. | For restitution and reimbursement sufficient to cover all prescription costs the City |
| 4 |   |   | of Henderson has incurred related to opioids due to Defendants' wrongful conduct, |
| 5 |   |   | with said amount to be determined at trial; |
| 6 |   | 6. | For restitution and reimbursement sufficient to cover all costs expended for health |
| 7 |   |   | care services and programs associated with the diagnosis and treatment of adverse |
| 8 |   |   | health consequences of opioids use, including but not limited to addiction due to |
| 9 |   |   | Defendants ' wrongful conduct, with said amount to be determined at trial; |
| 10 |   | 7. | For restitution and reimbursement for all prescription costs incurred by consumers |
| 11 |   |   | related to opioids; |
| 12 |   | 8. | For such other and further extraordinary equitable, declaratory and/or injunctive |
| 13 |   |   | relief as permitted by law as necessary to assure that the Plaintiffs have an |
| 14 |   |   | effective remedy and to stop Defendants' promotion and marketing of opioids for |
| 15 |   |   | inappropriate uses in the City of Henderson, currently and in the future; |
| 16 |   | 9. | For disgorgement; |
| 17 |   | 10. | Costs of suit, reasonable attorney fees, interest incurred herein; and |

///
///
///
///
///
///
///

1    11.    For such other and further relief as is just and proper.

2    DATED this 22ᵗʰ day of August, 2019.

3

4                                    CITY OF HENDERSON

5
                                     _____
6                                    NICHOLAS G. VASKOV, ESQ.
                                     City Attorney
7                                    Nevada Bar No. 8298
                                     NANCY D. SAVAGE, ESQ.
8                                    Assistant City Attorney
                                     Nevada Bar No. 392
9                                    240 Water Street, MSC 144
10                                   Henderson, NV 89015
                                     (702) 267-1200 Telephone
11                                   (702) 267-1201 Facsimile
12                                   nancy.savage@cityofhenderson.com

13
                                     EGLET ADAMS
14

15                                   _____
                                     ROBERT T. EGLET, ESQ.
16                                   Nevada Bar No. 3402
                                     ROBERT M. ADAMS, ESQ.
17                                   Nevada Bar No. 6551
18                                   RICHARD K. HY, ESQ.
                                     Nevada Bar No. 12406
19                                   400 S. 7th Street, 4th Floor
                                     Las Vegas, NV 89101
20                                   Tel.: (702) 450-5400
21                                   Fax: (702) 450-5451
                                     E-Mail  eservice@egletlaw.com
22

23

24

25

26

27

28

                                     91

1

## DEMAND FOR JURY TRIAL

2

Plaintiff, by and through its attorneys of record, hereby demands a jury trial of all of the

3

4   issues in the above matter.

5       DATED this 22 day of August, 2019.

6

7                                    CITY OF HENDERSON

8

9                                    NICHOLAS G. VASKOV, ESQ.
10                                   City Attorney
                                     Nevada Bar No. 8298
11                                   NANCY D. SAVAGE, ESQ.
                                     Assistant City Attorney
12                                   Nevada Bar No. 392
13                                   240 Water Street, MSC 144
                                     Henderson, NV 89015
14                                   (702) 267-1200 Telephone
                                     (702) 267-1201 Facsimile
15                                   nancy.savage@cityofhenderson.com

16

17                                   EGLET ADAMS

18

19                                   ROBERT T. EGLET, ESQ.
                                     Nevada Bar No. 3402
20                                   ROBERT M. ADAMS, ESQ.
                                     Nevada Bar No. 6551
21                                   RICHARD K. HY, ESQ.
22                                   Nevada Bar No. 12406
                                     400 S. 7th Street, 4th Floor
23                                   Las Vegas, NV 89101
24                                   Tel.: (702) 450-5400
                                     Fax: (702) 450-5451
25                                   E-Mail  eservice@egletlaw.com
                                     *Attorneys for Plaintiff, City of Henderson*
26

27

28

                                     92